## JAMES WELDON JONES *v.* STATE OF MARYLAND

[No. 216, September Term, 1971.]

*Decided December 20, 1971.*

678

The cause was argued before THOMPSON, MOYLAN and GILBERT, JJ.

*Bruce R. Harrison* for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Joseph C. Sauerwein, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

James Weldon Jones, the appellant, was convicted of manslaughter after a jury trial in the Circuit Court for Prince George's County; he was sentenced to a term of ten years. He contends on appeal: (1) the trial judge erred in excluding testimony of several witnesses because of a violation of an order to sequester witnesses

pursuant to Md. Rule 753; and (2) that it was error to exclude the appellant's testimony concerning the violent and dangerous acts and reputation of the deceased.

Charlotte E. Alexander testified that about 1:30 a.m. on April 18, 1970, she drove the deceased's Maverick to Bass' Restaurant and stopped near the entrance to a parking lot. Appellant, driving a red Volkswagen, stopped behind them and blew his horn; when she didn't move the car, he approached her car and said "Move." When she declined to move, telling him to drive around her car, he walked to the front of the Maverick and wrote down the license number. After repeating the process at the rear, he got back into his car and continued to write. Her passenger, the deceased, became provoked at this and walked to the Volkswagen. An argument ensued between the two men and the deceased reached into the appellant's car and grabbed the pencil with which he was writing. Mrs. Alexander stood near the deceased during the argument. Appellant and three of his companions got out of the Volkswagen and the witness and the deceased stood facing the four. Two of the appellant's companions and the witness attempted to calm both the deceased and appellant. The argument became more heated; appellant reached into his coat pocket, pulled out a revolver, and shot the deceased. She testified the first shot struck the deceased in the thigh and he fell to one knee; with the second shot, the deceased fell on his back. The appellant continued to pull the trigger even after all six cartridges had been discharged. While the shooting was in progress, one of the appellant's companions stated, "You don't have to shoot him like that." Police officers immediately approached and directed appellant to drop his gun.

Mrs. Alexander testified that the deceased was a large man weighing over 200 pounds and that the appellant was a small man. On cross-examination, she testified just before the pistol was drawn, appellant's lady companion indicated appellant was a policeman. She testified that she saw the deceased with no weapon, but heard at the hospital that he had had a knife.

Dr. George L. Sigalos, a pathologist at Prince George's General Hospital, testified that the deceased died as a result of hemorrhaging from six bullet wounds, one of which was in the upper abdomen, one in the lower abdomen, one above the right knee, a superficial wound on the left leg just above the knee, another one on the left leg and one in the groin. The doctor testified that the deceased's wounds indicated that some of the bullets could have been fired while the deceased was in a standing position, others while he was in a supine position; the doctor did not specify which wounds were inflicted in either position. He testified that the examination showed that the blood of the deceased had an alcoholic content of 0.09%.

Detective Dennis Pavlik testified that he arrived at the scene about fifteen minutes after the shooting occurred and had pictures taken. He measured certain distances which indicated that, if no other cars were parked there at the time, the appellant could have conveniently driven around deceased's car. He testified there were six empty cartridges in the appellant's revolver when he examined it. He produced a pocket knife with a two and one-half inch blade which he stated another officer found in the right hand of the deceased. Another knife, with a blade of approximately 6 inches, was found on the parking lot approximately 8 feet from the deceased.

Lizzie Young, a witness produced by the defense, testified she was with the appellant at the time of the shooting and that she was his friend. She said that in addition to appellant and herself, Willie David Young, her brother, and one Alvin Robinson were in appellant's automobile. She stated that the appellant drove up behind the car driven by Mrs. Alexander and requested that Mrs. Alexander move the car so that he could get through. He then returned immediately to his car and got inside; that he did not go to the front of the other car. While the appellant was sitting in his car, the deceased came from the restaurant with a bag in his hand and began to get into

his car, but Mrs. Alexander got out and both of them came back to the Volkswagen. The appellant was getting ready to write down the tag number when the two approached asking him, "What the hell he was writing down." She immediately informed the deceased that the appellant was a police officer whereupon the deceased became very abusive and threatened to kill him. The deceased slapped the pen out of appellant's hand and then slapped his face two or three times after which the appellant and all the occupants of his car got out. Appellant attempted to back away but the deceased insisted he was going to kill him. The deceased had his hand in his pocket throughout the conversation. She saw the appellant reach for his pistol and observed other nonuniformed armed men; she found out later that these were special policemen. She did not observe any weapon in the hand of the deceased.

Willie David Young's testimony was not materially different from that given by his sister. He quotes the deceased, after being informed that the appellant was a police officer, as follows: "Damn the roller." (interpreted by the witness to mean a police officer) "I do more than smack that mother. I will kill [him] . . . ." After several such threats, the deceased started walking toward the appellant, who then pulled his revolver. The witness never heard the appellant threaten the deceased. He saw no weapon on the deceased, but testified that the deceased had his hand in his pocket at the time of the shooting.

Sergeant John C. Rainey, testified that he was on the parking lot when he heard the shooting. He approached the appellant and directed him to face the car and place his hands on it. The deceased was then lying on the ground. As the deceased was being placed on the stretcher, his right arm fell and a pocket knife fell out of his sleeve. The blade was open. This occurred about 5 minutes after he arrived at the scene and the only person near the body during that interval was Mrs. Alexander.

Frank Calvin Sigmon, a former police officer, testified that he arrived at the parking lot prior to Sergeant Rainey. He disarmed the appellant and at that time, observed a knife blade extending from the deceased's sleeve. Because he was off duty, Sigmon did not touch the knife, nor allow anyone else to do so. He pointed it out to Sergeant Rainey when he arrived a few moments later.

The appellant testified that he was a police officer for the Metropolitan Police Department of The District of Columbia and assigned to the Tactical Squad. On the night in question he had been on a "stakeout detail" early in the evening. After he got off work he went to the home of Elizabeth Young, his "girlfriend," and later they started to Bass' liquor store. A Maverick driven by Mrs. Alexander was blocking his way so that he could not pass. He got out of his car and requested the lady to move over a little bit so that he could pull around her. She refused. He got back into his car, took out his pen and pad and started writing the type of car, the year and tag number on the pad. He was particularly interested in the tag number because it had a new series of digits, 778, with which he had not become familiar. The deceased and Mrs. Alexander approached his car and became upset because he was writing down the number; at that time his companion, Miss Young, informed them that he had "a right to" because he was a member of the police department. In response, the deceased became enraged and with fescennine invective conveyed his general dislike for police officers. The deceased then knocked appellant's pen out of his hand, slapped his face a couple of times and threatened to kill him; appellant stepped out of the car and the deceased pushed him back against it. Mr. Robinson tried to talk to the deceased; and David, the other male companion, tried to talk to appellant. The deceased continued to say he was going to kill appellant, claiming to have a gun; and he continued to keep his hand in his pocket. The deceased pushed Mr. Robinson away, and pulled his hand out of his pocket. When appellant saw something shiny in his hand he pulled his

revolver and shot him. After the first two shots, the deceased continued to advance, and "I just shot the rest of them." Officers in civilian clothes then approached; he complied when directed to put his hands up and drop his gun. No one approached the body except Mrs. Alexander and the two police officers.

Appellant further testified he pointed the gun at the deceased but at no particular part of his body. He said, "I paused after I shot first, and I felt and sounded like I heard another shot. It seemed like he was shooting at me. I thought I was shot. I didn't feel anything but I thought I was shot. That is the reason I shot the other rounds." He testified on cross-examination that he could not drive around the deceased's car because other cars were blocking the route.

In order to properly rule on admissibility, the court heard, out of the presence of the jury, the appellant's testimony as to what he knew about the deceased. Part of his work as a police officer was to frequent high crime areas in civilian clothes to obtain information about criminal activity. He testified that approximately 18 months prior to the shooting, he had occasion to look up the deceased's records and picture in the police department. The record included a conviction for aggravated assault with a knife. Looking through his car window, the deceased's face seemed familiar; when he got a better look, he was "99% sure" that this was the same man whose record he had looked up. After he was released from jail, he re-examined the records to confirm what he had remembered on the night of the crime. He had previously checked the record because he had observed the deceased in a pool room called "The Golden Que" and he had then appeared belligerent. His inquiries revealed deceased was "known to be bad and carried himself as being bad. They said he is a bad so and so." He testified that he remembered this information at the time of the shooting. It was his regular practice as a police officer to check the records of persons he had found of a

belligerent nature. The court declined to admit this testimony saying that it was too conjectural to depend on his memory of an incident which had occurred 18 months before the crime saying, "I'm not so naive that I can believe he remembers something 18 months."

At the conclusion of the testimony the appellant proffered as a witness, the deceased's mother stating that she would testify to the violent reputation of the deceased. The court declined to permit the witness to testify, ruling that since she had been present in the courtroom during the entire trial, and not sequestered as were all other witnesses, pursuant to Md. Rule 753, she could not testify. Appellant also proffered the daughter and sister of the deceased for the same purpose but the court also declined to permit their testimony on the same basis. Even though the admission of the testimony of witnesses who violate a sequestration order is in the sound discretion of the trial judge, *Hill v. State,* 9 Md. App. 65, 262 A. 2d 573, we think the trial judge probably should have admitted the testimony of the mother, daughter and sister of the deceased as to his reputation for violence. We do not need to rule upon the point since we find reversible error elsewhere.

The general rule concerning the admissibility of an accused's testimony as to his prior knowledge of deceased's reputation and prior conduct was stated by the Court of Appeals of Maryland in *Jones v. State,* 182 Md. 653, 660, 35 A. 2d 916, "Where the defendant claims that he acted in self-defense, and there is some testimony of an overt act on the part of the deceased and some testimony tending to support the theory of self-defense, where the necessity for the defendant's resorting to it should be judged by the facts as they appeared to him, whatever they truly were, he may give in evidence whatever he knew of the character, prior conduct, threats or other utterances of the person with whom he was contending, which is admitted in evidence, not to show that the deceased was bad, but in this special instance was danger-

ous." See also *Gunther v. State,* 228 Md. 404, 179 A. 2d 880. The state attempts to distinguish the instant case on the basis that in *Jones,* the Court was concerned with recent violent acts of the deceased. While the distinction is valid, the statement of the rule in the broad form is so supported by reason and authority that we will accept it as the law of Maryland.

See 2 Wigmore, *Evidence* § 246, wherein it is said: "Where a defendant charged with murder asserts that he killed in self-defense, his state of mind at the time of the killing becomes material; and an important element in determining his justification is his belief in an impending attack by the deceased. The reputation of the deceased for a violent, dangerous, or turbulent disposition is thus a circumstance which would cause such a belief:" . . . "The admissibility of such evidence is recognized, on principle, in all but a few jurisdictions. The law varies, in the several jurisdictions, only as to the definition of the chief details that are made conditions of admissibility." As stated in *Jones,* the limitations suggested by Professor Wigmore are: (1) there must have been some overt act by the deceased; (2) the issue of self-defense must be in doubt; and (3) the reputation must be known to the defendant.[1]

As to the admissibility of the defendant's knowledge of the 1963 conviction for aggravated assault with a knife, see 2 Wigmore, *Evidence* § 248, "The fact that the circumstance creating apprehension is a single act or series of acts, instead of a general character, does not necessarily destroy its capacity to create apprehension. Nor does its distance in time from the moment of the affray necessarily have that effect. Such particular acts may or may not in a given case be calculated to create apprehension; but there is no reason for a fixed rule of

---

1. In consideration of this case, we are not concerned with under what circumstances the reputation may be admitted as affirmative evidence, though not known to the accused. See 1 Wigmore, § 63, 1 A.L.R.3d 571, 1 Wharton, *Criminal Evidence,* § 217 and Jones *Evidence,* § 149.

exclusion, invariably forbidding their consideration: . . . . The state of the law has come on the whole to favor the admissibility of such facts. Nevertheless, in the majority of jurisdictions, such evidence was, for a long time, absolutely excluded. In some instances this was probably due to a notion that the deceased's character is sought objectively to be shown by particular acts; but the real purpose is merely to show such conduct as would naturally excite apprehension, whether it objectively indicates a fixed trait of character or not. Certainly an analogies of the law (apart from the common sense of the situation) favor such evidence; for if particular vicious acts of an animal are relevant to show that its owner was warned of its viciousness, and if particular misconduct of an employee is relevant to show that his employer was warned of his incompetency, then particular deeds of unscrupulous violence may well be deemed relevant to show an apprehension of violence from such a person. The true solution is to exercise a discretion, and to admit such facts when common sense tells us that they could legitimately affect a defendant's apprehensions."

In the instant case, the appellant testified that he had observed the deceased 18 months prior to the shooting, that his reputation for being a dangerous character was such as to cause him to look up deceased's criminal record, and that at the time of the shooting he was 99% certain of deceased's identity and reputation. In the language of Professor Wigmore, common sense would indicate that this information would have a considerable affect on his state of mind at the time of the shooting even though that knowledge was gained some eighteen months prior thereto, and was based in part on a conviction that had occurred some years before. Although the trial judge stated that he did not believe the witness could recall the events, the witness stated that he did recall them and his credibility was for the trier of fact, in this case, the jury, to decide.

Citing *Thomas v. State*, 9 Md. App. 94, 96, 262 A. 2d

797, the State contends that, in any event, the error was harmless because it is apparent that the appellant used more force than was necessary to repel the attack. While this is true if you accept only the testimony of Mrs. Alexander, it is not true if you accept the testimony of the appellant and his companions. All testified that the deceased threatened to kill the appellant and kept his hand in his pocket. The appellant testified he observed a shiny object in the deceased's hand and that the deceased continued to advance on him even after he was shot. Of course, the police officers testified that a knife was on the person of the deceased immediately after the shooting. We think the jury was entitled to know the reputation of the deceased at least insofar as it was known to the accused at the time of the shooting to enable them to properly assess the state of mind of the appellant at that moment. In the language of *Jones v. State, supra,* he was entitled to, "give in evidence of whatever he knew of the character, prior conduct, threats or other utterances of the persons with whom he was contending." There was some evidence of an overt act on the part of the deceased; and some evidence to support the theory of self-defense; and some question as to who was the aggressor; thus if the appellant knew the deceased had a reputation for violence and of his prior violent acts, he was entitled to present that information to the jury for its consideration and the trial court committed reversible error in excluding it.

*Judgment reversed.*
*Case remanded for new trial.*