## WILLIAM LESLIE THOMAS *v.* STATE OF MARYLAND

[No. 334, September Term, 1969.]

*Decided March 9, 1970.*

The cause was submitted to MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Leonard J. Harmatz* for appellant.

*James F. Truitt, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Luther C. West, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

William Leslie Thomas (appellant) admits that he shot and killed Victor Watkins. However, the lower court, sitting as a jury at the trial in the Criminal Court of Baltimore, found that the evidence, in fact, was sufficient to establish circumstances of alleviation which reduced the offense to manslaughter and found appellant guilty of that crime. Thus appellant met his burden of rebutting the presumption, which is the rule of law followed in this jurisdiction, that all homicides are committed with malice aforethought and constitute murder in the second degree, since the evidence, to the satisfaction of the court, negated the inference of malice arising from the use of a deadly weapon. See *Chisley v. State,* 202 Md. 87, 105; *Lindsay v. State,* 8 Md. App. 100, 104-109. He now urges us to hold that the evidence was sufficient in law to establish that the homicide was not felonious as committed in justifiable or excusable self-defense, rendering him not culpable for the killing. We may so hold only if we are able to determine that the judgment of the lower court that the homicide was not committed in justifiable or excusable self-defense was, on the evidence before it, clearly erroneous. Maryland Rule 1086. We are not able to so determine and affirm the judgment.

We had occasion to discuss justifiable and excusable self-defense in *Whitehead v. State,* 9 Md. App. 7 (1970).[1] Justifiable self-defense is where a person is feloniously assaulted, being without fault himself, and necessarily kills his assailant to save himself from death or

---

1. Unlike *Whitehead* there is no question here whether the offense was murder in the second degree or manslaughter, appellant having been found not guilty of murder.

great bodily harm, or from other felony attempted by force or surprise. The circumstances of the instant case clearly do not place it within the ambit of the rule as to justifiable self-defense. Excusable self-defense is where a person becomes engaged in a sudden affray or combat, and in the course of the affray or combat, necessarily, or under reasonably apparent necessity, kills his adversary to save himself from death or great bodily harm after retreating as far as he can with safety, provided the force used in the killing is not unreasonable or excessive. See *Tipton v. State*, 1 Md. App. 556, 560.[2]

The pathological diagnoses in the report of the autopsy performed on Victor Watkins included:

"I. Multiple gunshot wounds:
  (a) Gunshot wound of right shoulder and chest with perforation of both lungs and aorta with bilateral hemothorax and mediastinal hemorrhage (bullet recovered)
  (b) Gunshot wounds of left forearm, left hand, and right upper thigh (through and through)
II. Laceration of scalp
III. Abrasion of left knee."

The opinion of the medical examiner was that Watkins died "as a result of a gunshot wound of right shoulder and chest with extensive internal hemorrhage." He noted, "This bullet was recovered at autopsy. The bullets causing the three remaining gunshot wounds all exited from the body."

Appellant made a statement to the police which was admitted in evidence without challenge. It included the following:

---

2. For discussion of homicide in self-defense see 1 *Wharton's Criminal Law and Procedure* (Anderson) §§ 213-240, pp. 464-520; *Clark and Marshall, A Treatise on the Law of Crimes*, 6th Ed., §§ 7.03-7.05, pp. 423-444; *Perkins, Criminal Law* (1957), pp. 883-919.

"For one, yes, I shot him. We were inside the Soul Shack,[3] and he was arguing with someone about a pool game. So, he was making his way towards the door, and almost knocked me down. I told him all you had to do was say excuse me, and it would be over with. Then, he say, yes, come on outside, and I'll say excuse me. I asked him why go way out there to just say excuse me. And he said, come on out and find out. I came out with him and walked up to a small alley, and at the alley, him and his friend acted as if they were getting into a car or getting something out of the car. He asked me if I still wanted him to say excuse me, and he pushed me. When he pushed me, I hit him. He grabbed a stick or a pipe from a little boy who was standing there watching. When he picked the stick up as if to hit me, I put my hand in my coat pocket and pulled out a pistol and fired at him. I think I hit him in the leg, but he kept on coming. I shot two more times. And when he fell on me, he hit the pistol, and the pistol went off and shot me in the foot. Then, he got up off the ground and ran down the street towards the Soul Shack. Someone grabbed me by the arm, and then I threw the pistol down and jerked away and walked up the street."

He said the pistol was a .25 caliber automatic. There was also evidence that Watkins went into the bar with a co-worker and friend, William Campbell. Campbell testified he got Watkins settled down in the bar after the incident with appellant and they "proceeded on out the door. We walked past this same guy he bumped into, and the guy never said anything * * *. We walked on to the door out the bar. We didn't say anything to anybody. We got about fifteen steps out the front door, and all these bunch of guys was around us, about five or six or seven of them.

---

3. A bar.

98

* * * They came out the front door" of the bar. Appellant was one of them. It was established that appellant came back to the bar about 1:30 A.M., several hours after the shooting, and talked to the operator of the bar. The operator told appellant that the man who had been shot was dead and asked him if he knew who shot him. Appellant said, "Yes, I did." The operator then asked appellant why and appellant told him "because he has a big mouth, and he was a snitch."

The lower court made factual findings in arriving at the verdict. It found that the homicide was committed in the course of a sudden affray, "a bar room brawl." So the homicide would not be justifiable but may have been excusable. But even if otherwise excusable, appellant would still be culpable if the force he used was unreasonable or excessive, that is more force than the exigency of the situation reasonably demanded. See *Guerriero v. State,* 213 Md. 545, 549. The court found the force used by appellant was excessive and unreasonable. In so determining it found as a fact that the deceased was armed only with a handle of a wagon which he grabbed from a boy after being hit by appellant during the affray. The court said:

"However, there is no question in my mind that that does not excuse the fact that Thomas shot him. There is no question that Thomas used excessive force. He used excessive force for two reasons: first of all, he was surrounded with his cohorts, and certainly he should have been able to take care of himself, even against this man who was obese, 265 pounds, and some six-foot-one inch tall.

Thomas, himself, is a man who is pretty large, and certainly he should have been able to defend himself, even against the wagon stick or the wagon piece of metal. I think that he did use excessive force. I think that this was a killing that occurred during the course of a brawl. I

think it required Thomas to contain himself a great deal more than he did in pulling out the gun. I think that he, himself, gives the tone to it when he says that when he grabbed this particular—'When he picked the stick up as if to hit me, I put my hand in my coat pocket and pulled out the pistol and fired at him.'

It would seem to me that he was not in sufficient fear, at that point, of any serious or grievous bodily harm to justify his shooting the man."

As relating to self-defense there is a distinction between deadly force—that which is intended or likely to cause death or great bodily harm—and nondeadly force—that which is neither intended nor likely to do so—just as there is a distinction between force which is reasonable and force which is unreasonable.

"Deadly force and reasonable force are neither mutually exclusive nor collectively exhaustive. Deadly force is unreasonable if nondeadly force is obviously sufficient to avert the threatened harm, but may be entirely reasonable under other circumstances. And even nondeadly force is unreasonable if it is obviously and substantially in excess of what is needed for the particular defense." *Perkins on Criminal Law, supra,* p. 883.

Here it is patent that the force used by appellant was deadly, and on the finding by the trier of fact to the effect that a nondeadly force would have been sufficient to avert the threatened harm, the force used by appellant was unreasonable. As the force was unreasonable, the homicide was not excusable. And as there was evidence before the court, which it found to be credible, supporting its factual findings, they were not clearly erroneous. We hold that appellant was culpable.

Appellant was also found guilty generally under an in-

dictment charging the offense proscribed by Code, Art. 27, § 150 in the 1st count and the offense proscribed by § 151 in the 2nd count. A general sentence of 6 months was imposed on the convictions to run concurrently with the sentence of 8 years imposed on the conviction of manslaughter.

Section 150 provides that any person shall be guilty of a misdemeanor who

1) makes or causes to be made a false statement, report or complaint
2) to any police officer of this State, or of any county, city or other political subdivision thereof
3) knowing the same or any material part thereof, to be false, and
4) with intent:
   a) to deceive, and
   b) to cause an investigation or other action to be taken as a result thereof.

Section 151 provides that any person shall be guilty of a misdemeanor who

1) makes or causes to be made a false statement or report of the commission of a crime or of the existence of any condition imminently dangerous to public health or safety
2) to any official or agency of this State, or of any county, city or other political subdivision thereof
3) knowing the same, or any material part thereof to be false, and
4) with intent that such official or agency investigate, consider or take action in connection therewith.

Appellant now questions the sufficiency of the evidence. He alleges that the report made by him was only to doctors at the Franklin Square Hospital to which he went for treatment and he urges that since they were not po-

lice officers he may not be found guilty of the crimes as proscribed by the statutes. His argument might have merit if his allegation were true, but it is not. As his argument is based on an incorrect factual premise, it fails.

The homicide occurred about 9:30 P.M. on 15 November 1968. Officer Kevin Hildreth, a police officer of the Baltimore City Police Department, working in uniform, testified that he received a call about 11:15 P.M. on 15 November to go to Franklin Square Hospital "to get a report of a shooting." Upon his arrival he was met by appellant and "he gave me a report of being shot. He stated that he was walking north in the unit block of North Stricker Street at 8:20 P.M. on the 15th of November when a '62 or '64 * * * white Chevy occupied by three colored males passed slowly by him. One of the subjects in the automobile fired three shots in his direction. At this time, he stated that he felt a sharp pain in his right foot, but didn't pay any attention to the pain. He then stated that he went into Green's Bar, located at 15 North Stricker Street, and began to dance. After being in the bar approximately one hour, he stated he felt a sharp pain in his foot, and at that time, there was blood on his shoe, at which time he stated he went to Franklin Square Hospital to seek treatment for this wound." The officer said that he investigated the report. The investigation continued the next day but he was unable to locate appellant.[4]

We have no difficulty in determining that, on the testimony of Officer Hildreth, a finding by the trial court that appellant made a false statement to a police officer, know-

---

4. In the statement appellant later gave the police concerning the homicide, the following appears:

"Question: William, after you reported to the nurse at Franklin Square Hospital that somebody shot you in the foot from a passing car, did you tell the same story to the police?

Answer: No, I told the police that I was practicing Karate, and accidently stuck me in the foot with an umbrella.

Question: Then, this was a false report, is that correct?

Answer: Yes."

ing it to be false, with intent to deceive and to cause an investigation or other action to be taken as a result thereof, was not clearly erroneous. The 1st count of the indictment properly charged the offense proscribed by Code, Art. 27, § 150, and the proof was sufficient to establish those allegations. We hold as a matter of law that the evidence was sufficient to sustain the conviction under the 1st count. See *Williams v. State,* 5 Md. App. 450.

Although the general verdict of guilty was a conviction under the 2nd count also, *Manning v. State,* 2 Md. App. 177, appellant's argument does not go to the conviction under that count. See Rules 1031 c 4 and 1046 f. In any event, we call attention to *the fact that a general sentence* was imposed on the convictions under the 1st and 2nd counts and that it ran concurrently with the sentence imposed on the conviction of manslaughter. See *Hayette v. State,* 199 Md. 140, 142.

*Judgments affirmed.*