Barbara THOMPSON

v.

Sergeant Kenneth ANDERSON.

Civ. No. K–76–697.

United States District Court,
D. Maryland.

Dec. 27, 1977.

`S. Michael Floam, Baltimore, Md., for plaintiff.

Robert C. Verderaime, Baltimore, Md., for defendant.

`FRANK A. KAUFMAN, District Judge.

Plaintiff, seeking damages against defendant [1] for violating her rights by unconstitutionally ordering a search of her house and by unconstitutionally arresting her, proceeds herein under 42 U.S.C. § 1983. Plaintiff also asserts a similar claim (for false imprisonment) under Maryland law and pursuant to pendent jurisdiction.[2]

### FACTS

After a non-jury trial on liability issues only,[3] this Court makes the following findings of fact:

On January 31, 1976, defendant, a Baltimore City policeman with the rank of Sergeant, was acting as shift commander for the day watch of the Northwest District of the Baltimore City Police Department. In response to a report from Officer Nicholson, also of the Northwest District, defendant drove to the scene of an investigation of a robbery which had just occurred. On arrival he conferred with Nicholson and ascertained that Nicholson had been chasing two boys who had been pointed out to him by the robbery victim, and that two witnesses (of the chase only) had identified one of the two boys Nicholson was chasing as Keith Thompson. The two witnesses were young, but their identifications were positive. They stated that they had known Keith for a year and had played with him in the neighborhood. Furthermore, they were able to direct Nicholson to Keith's home.

Anderson was already acquainted with Keith Thompson, and knew where he lived,

1. There is only one defendant herein. No equitable relief is sought.

2. All claims were originally brought in the Superior Court of Baltimore City, Maryland, but were subsequently removed to this Court by defendant under 28 U.S.C. § 1441.

3. The damage issues have been reserved for later trial, if necessary.

that he was about 16 years old, and that the crime and the chase were in the vicinity of the Thompson home. After conferring with Nicholson, Anderson, using police radio, informed a number of officers under his command that Keith Thompson was a robbery suspect and ordered them to "try up" the Thompson house. The term "try up" (which is sometimes called "try out" and/or "turn-up") means to search a dwelling (or other premises) in order to ascertain if a specified wanted person is on the premises.[4]

Neither Anderson nor any other officer sought a warrant to search the Thompson house, or to arrest Keith. At trial Anderson stated that there were several reasons why he did not seek any warrant:

First, the brief period of time between the offense and the time of the investigation gave rise, in his opinion, to a situation of "fresh pursuit." The Baltimore City Police Department considers a "fresh pursuit" as the pursuit of a person believed to have been involved in the commission of a felony, which pursuit takes place reasonably promptly after the occurrence of the crime.[5] The practice of the Baltimore City Police Department with respect to ordering "try ups" without seeking a search warrant is that, in a case of "fresh pursuit," no such warrant need be sought. That practice, however, is not set forth in any document or manual. In ordering his officers to "try up" the Thompson house without seeking a warrant, Anderson believed that he was following the Baltimore City Police Department's approved, though unwritten, practice.

Additionally, Anderson did not seek either an arrest or search warrant because he believed that there was no need to do so in view of the apparent reliability of the identifications; the fact that the suspect had been chased in an area not far from his home;[6] Anderson's own knowledge that in the past Keith Thompson, when in trouble, had fled home;[7] and Anderson's belief, based upon his experience as a police officer, that most people whose arrest is being sought for violent crimes are located by police in their homes.

Several officers preceded Anderson to the Thompson home. They included Officer Grove, who was the "officer in charge" of the sector in which the incident occurred. Pursuant to the order received from Anderson, Grove approached the entrance to the Thompson house and informed plaintiff, the mother of Keith, that her son was suspected of a serious crime and that her house would be searched if she did not surrender her son. Plaintiff stated that the officers could search the house if they so desired, but that they would not find her son, because he was at the Maryland State Training School. The officers then conducted a full and thorough search of the house, but did not find Keith.

Defendant arrived at the Thompson house while the search was in progress. Plaintiff told him, as she had previously

---

**4.** *See Lankford v. Gelston*, 364 F.2d 197 (4th Cir. 1966) (en banc), in which the Fourth Circuit enjoined the Baltimore City Police Department from searching private dwellings, other than a suspect's home, pursuant to mere anonymous tips. In *Lankford*, the Court wrote (at 199):

> In police parlance a turn-up is an investigation of a location and usually includes a search of the premises. * * *

**5.** Md.Ann.Code art. 27, §§ 595–602 authorizes officers of other states to make arrests in Maryland under certain conditions. Section 599 states:

> The term *"fresh pursuit"* as used in this subtitle shall include fresh pursuit as defined by the common law, and also the pursuit of a person who has committed a felony or who is reasonably suspected of having committed a felony. It shall also include the pursuit of a person suspected of having committed a supposed felony, though no felony has actually been committed, if there is reasonable ground for believing that a felony has been committed. Fresh pursuit as used herein shall not necessarily imply instant pursuit, but pursuit without unreasonable delay.

**6.** When last seen, the two boys being chased were running neither directly toward nor directly away from Keith Thompson's home.

**7.** Anderson, however, testified that he had never himself arrested Keith, and that he could only recall one occasion on which Keith was arrested by officers in the District.

stated to the officers, that Keith was at the Training School. Plaintiff, at trial, testified that she showed Anderson a letter from the school. Anderson and other officers testified that they did not recall any such letter. Nor was such a letter offered as evidence at trial. In any event, Anderson decided to check with the school, left the Thompson house, went to a nearby police call box, called the desk sergeant and requested him to call the school and ask if Keith Thompson was there. Anderson also gave the desk sergeant Keith's home address to pass on to the school as further identifying information. The desk sergeant reported to Anderson that the school had no resident named Keith Thompson. Anderson instructed the desk sergeant to call back, and to check again. The sergeant's second call produced no further information. Anderson thereupon returned to the Thompson home and informed plaintiff that there was no Keith Thompson at the school. Believing that plaintiff was lying, Anderson gave her a final opportunity to tell him where Keith was. When she still insisted that Keith was at the Training School, Anderson placed her under arrest for "hindering a police officer." In doing so he relied on § 7.65, at page 169, of the Baltimore City Police Department's Digest of Criminal Law and Procedure. That section provides:

> It is unlawful for any person to resist or in any manner to hinder or prevent a public officer in the lawful execution of his duty, knowing him to be such officer. Penalty, fine or imprisonment, or both (Common Law offense). Desty, Criminal Law, sec. 76. The District Court has jurisdicition [sic] in such cases.

Plaintiff was handcuffed and escorted to the police transport wagon in the presence of certain of her children, neighbors and bystanders. After arrival at the station, she continued to insist that Keith was at the Training School. As a result, before proceeding to "book" her, Anderson personally called the school, spoke to the supervisor on duty at the time, and asked if there was anyone at the school named Thompson, mentioning, as well, the street on which the Thompsons lived. After a long pause, the response came back that a Samuel Keith Thompson, of that address, was at the School. Anderson, after checking with plaintiff to make certain that the person was Keith, then released plaintiff, drove her home and apologized.

When asked at trial to explain why he made the call after arrest and transportation to the station, rather than before, Anderson stated that generally the scene of an investigation is not conducive to a complete and competent investigation, and that therefore the "backup investigation" of an offense often occurs at the station. Nicholson's report of the incident states that the transportation of Mrs. Thompson to the station was "for further investigation." Plaintiff contends that her arrest was an excuse or subterfuge to get her to the police station. While it is true that Anderson desired to continue the investigation, it is also clear that, if his trial testimony is deemed reliable and credible (and this Court so considers it), Anderson also believed that a crime was being committed in his presence and that he had a right to arrest for the same.[8]

## ISSUES

The questions arise as to whether Anderson violated any of plaintiff's rights by the search or the arrest and, if so, whether Anderson has established the good faith defense asserted by him as to both the search and the arrest.

### Probable Cause for Arrest

█ Under all of the circumstances, it was reasonable for defendant to believe that plaintiff was lying when she told him, at her home, that Keith was in the training school. Accordingly, if lying to the police regarding the whereabouts of a fleeing robber is a crime in Maryland, defendant had probable cause to arrest plaintiff. Conversely, if such lying is not a crime in Maryland, such probable cause did not exist.

8. Thus, this Court concludes that a "pretextuous" arrest did not take place herein. Cf. United States v. Gibson, 392 F.2d 373, 375 n.1 (4th Cir. 1968).

See *Ralph v. Pepersack*, 335 F.2d 128 (4th Cir. 1964), *cert. denied*, 380 U.S. 925, 85 S.Ct. 907, 13 L.Ed.2d 811 (1965), in which the Court stated (at 135): "[T]he law of the place of the arrest determines its validity."

There is a paucity of Maryland law as to whether such lying is a crime.[9] However, Md.Ann.Code art. 27, § 150 does provide:

> Any person who makes a false statement, report or complaint, or who causes a false statement, report or complaint to be made, to any peace or police officer of this State, or of any county, city or other political subdivision of this State, knowing the same, or any material part thereof, to be false and with intent to deceive and with intent to cause an investigation or other action to be taken as a result thereof, shall be deemed guilty of a misdemeanor and upon conviction shall be subject to a fine of not more than five hundred dollars ($500.00), or be imprisoned not more than six (6) months, or be both fined and imprisoned, in the discretion of the court.

The statute's inclusion of the element of *intent* to cause an investigation or the like may have been intended to restrict its application solely to false reports of crimes.[10] The only cases interpreting the statute are consistent with that reading.[11] In any event, it is not an overstatement to conclude that whether lying to the police is, in and of itself, a crime in Maryland is an open question. Neither the common law nor the Maryland statute clearly excludes or includes such a crime. It is possible that under certain conditions, and perhaps under those Anderson had probable cause to believe existed, lying to the police about the whereabouts of a fleeing robber constitutes being an accessory after the fact under Maryland law. But the answer to that question, under Maryland law, is also not clear.[12] There is authority in other jurisdictions that certain similar types of lying constitute hindrance of the police and thus a crime.[13] But it is also arguable that lying to the police is at best an activity not covered by any existing statute or common law doctrine.[14] In this case, further discussion

---

**9.** In *Heinze v. Murphy*, 180 Md. 423, 24 A.2d 917 (1942), a case in which plaintiff alleged assault and battery and also false imprisonment by a police officer, the arresting officer described the arrest of plaintiff therein, who had refused to answer questions regarding an auto collision involving his wife, as an arrest both for resisting an officer and for disorderly conduct. However, the officer had in fact charged the plaintiff only with disorderly conduct. Finding (at 428–29, 24 A.2d at 920) that "[t]here is no evidence that the profane language, if used, was heard by anyone except" the officer, the Court of Appeals of Maryland concluded that the disorderly conduct charge "could not be sustained." The Court did not focus at all upon the issue of resisting arrest. Accordingly, *Heinze* casts little or no light upon whether lying to an officer is a crime.

**10.** For a discussion of the history behind the statute's enactment, *see* Brumbaugh, *A New Criminal Code for Maryland?*, 23 Md.L.Rev. 1, 34 n. 108 (1963).

**11.** *See Barber v. State*, 23 Md.App. 655, 665, 329 A.2d 760 (1974), *cert. denied*, 274 Md. 725 (1975); *Thomas v. State*, 9 Md.App. 94, 99–102, 262 A.2d 797 (1969).

**12.** *See*, re accessories after the fact, *McClain v. State*, 10 Md.App. 106, 115, 268 A.2d 572, *cert. denied*, 259 Md. 733 (1970).

**13.** *See* 22 C.J.S. *Criminal Law* § 99d (1961) which states in part (at 278–79):

> Moreover, it has been held that a refusal to tell a public officer the names of the perpetrators of a crime, thus enabling them to escape, does not render one such an accessory; nor may the fact that one tells the officer a falsehood with respect to the crime with the intent that the perpetrators might avoid and escape arrest render one liable as accessory after the fact. On the other hand, there are cases which hold that if one not only keeps silent but afterward aids in concealing the crime, as by giving false information tending to mislead the public authorities, or if such concealment of knowledge or giving of false testimony is for the purpose of giving some advantage to the perpetrator of the crime, then he is guilty as an accessory after the fact. [Footnotes omitted.]

But *cf.*, with regard to 18 U.S.C. § 1071, which prohibits harboring or concealing a fugitive from justice and which has been held not to cover false statements regarding the fugitive's whereabouts, *United States v. Magness*, 456 F.2d 976 (9th Cir. 1972); *United States v. Foy*, 416 F.2d 940 (7th Cir. 1969).

**14.** *See*, with respect to possible constitutional and other problems existing with regard to a certain type of statute making the giving of a

of those issues is not required because, as this Court holds *infra*, defendant is entitled to the good faith defense he has asserted in this case.

### Good Faith Defense Re the Alleged Unlawful Arrest

In *Fidtler v. Rundle*, 497 F.2d 794, 802 (3d Cir. 1974), Judge Adams wrote:

Viewing good faith as a defense creates some difficulty in this case in light of the wise tenet that constitutional questions are to be avoided when disposition on nonconstitutional grounds is proper.[35]

[35] *See Ashwander v. TVA*, 297 U.S. 288, 346, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

This is so since the defense of good faith need become an issue only after the plaintiff has established a violation of civil rights. In this case, for example, the facts on which Fidtler bases his constitutional claims do not appear to be contested. Thus, the district court might well decide the legal question—i. e., whether those facts amount to a constitutional violation—without an evidentiary hearing on the good faith defense.

If Rundle asserts the good faith defense, however, and Fidtler responds by alleging lack of good faith, evidentiary proceedings may be necessary to resolve satisfactorily the disputed factual issues. In such situation, judicial resources may be conserved by the district court's deciding the constitutional question. This is so because if Fidtler's constitutional claims are rejected, the need for an evidentiary proceeding with respect to the good faith defense would be obviated.

Nonetheless, in light of the salutary precept that constitutional questions are to be avoided when appropriate to do so, and especially when a state statute is at issue that has not been interpreted in a similar context by the state court, we cannot say that a district judge would, in all instances, act improperly if he should determine whether the state officer was

false statement to a police officer a violation of the criminal law, Note, *Criminal Liability for*

acting in good faith before actually dealing with the constitutional issues.

Similarly, in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), a case in which damages were sought under 42 U.S.C. § 1983, Mr. Justice White dealt first with the "immunity" issues, reasoning:

Petitioners as members of the school board assert here, as they did below, an absolute immunity from liability under § 1983 and at the very least seek to reinstate the judgment of the District Court. If they are correct and the District Court's dismissal should be sustained, we need go no further in this case. Moreover, the immunity question involves the construction of a federal statute, and our practice is to deal with possibly dispositive statutory issues before reaching questions turning on the construction of the Constitution. \* \* \*

*See also Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977); Kattan, *Knocking on Wood: Some Thoughts on the Immunities of State Officials to Civil Rights Damage Actions*, 30 Vand.L.Rev. 941, 990–93 (1977).

■ In this case, this Court takes the view that whether lying to the police is a Maryland crime and if so whether there are constitutional prerequisites or impediments to prosecution therefor are knotty issues which need not be reached herein. However, the unsettled state of the law with regard thereto is quite material and relevant with regard to the defendant's assertion in this case of a good faith defense. That is because the question of whether the state of the law is settled or unsettled is one of the elements of a good faith defense. The presence or absence of malice on the part of a defendant and the conformity by a defendant-policeman of his actions to standard operating police procedures and practices are other key elements of that defense.

*False Statements to Federal Law Enforcement Officials*, 63 Va.L.Rev. 451, 459–60 (1977).

Good faith together with probable cause constitute a total defense by Anderson in this section 1983 suit for damages for unlawful arrest, assuming, arguendo only, that the arrest of Mrs. Thompson was unlawful. *Pierson v. Ray,* 386 U.S. 547, 556–57, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). That defense is also specifically available in a section 1983 case involving an alleged unconstitutional search. *Rodriquez v. Jones,* 473 F.2d 599 (5th Cir.), *cert. denied,* 412 U.S. 953, 93 S.Ct. 3023, 37 L.Ed.2d 1007 (1973). In *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narc.,* 456 F.2d 1339 (2d Cir. 1972), Judge Medina, writing for himself and Judge Waterman, held that the good faith defense was available with respect to a *Bivens*-type claim of unconstitutional search, and stated (at 1347) that that was the same as the section 1983 defense in *Pierson.* Judge Medina also held that the term "probable cause" as used in the common law defense of good faith and probable cause means something other than probable cause in the constitutional sense. In so doing, Judge Medina indicated that in order for each defendant police officer in that case to prevail upon his good faith defense, he

> need not allege and prove probable cause in the constitutional sense. The standard governing police conduct is composed of two elements, the first is subjective and the second is objective. Thus the officer must allege and prove not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable. And so we hold that it is a defense to allege and prove good faith and reasonable belief in the validity of the arrest and search and in the necessity for carrying out the arrest and search in the way the arrest was made and the search was conducted. We think, as a matter of constitutional law and as a matter of common sense, a law enforcement officer is entitled to this protection.

Judge Lumbard, in a separate concurring opinion, stated (at 1348–49):

Ordinarily when a suit of this type is brought a court will already have determined that there was no probable cause for the arrest and search complained of. Nevertheless the agent has a complete defense if he can convince the trier of the fact that he acted in good faith and that it was reasonable for him to have believed that the arrest and search were lawful. Thus there are two standards to be considered. The first is what constitutes reasonableness for purposes of defining probable cause under the fourth amendment for the protection of citizens against governmental overreaching. The other standard is the less stringent reasonable man standard of the tort action against governmental agents. This second and lesser standard is appropriate because, in many cases, federal officers cannot be expected to predict what federal judges frequently have considerable difficulty in deciding and about which they frequently differ among themselves. It would be contrary to the public interest if federal officers were held to a probable cause standard as in many cases they would fail to act for fear of guessing wrong. Consequently the law ought to, and does, protect governmental agents if they act in good faith and with a reasonable belief in the validity of the arrest and search.

In *Hill v. Rowland,* 474 F.2d 1374 (4th Cir. 1973), Judge Boreman, dealing with a warrantless arrest, expressly embraced *both* the majority opinion *and* the concurrence in *Bivens.*[15] Subsequently, the Fourth Circuit dealt with that defense in contexts other than police activity. *Eslinger v. Thomas,* 476 F.2d 225 (4th Cir. 1973) (denial of job by clerk of state legislature); *Skinner v. Spellman,* 480 F.2d 539 (4th Cir. 1973) (denial of due process in prison disciplinary proceeding). More recently, in *McCray v. Burrell,* 516 F.2d 357 (4th Cir. 1975) (en banc), *cert. denied,* 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976), Judge Winter wrote (at 370–71):

---

**15.** *See also Boscarino v. Nelson,* 518 F.2d 879 (7th Cir. 1975).

Our prior decisions establish that when a prison guard acts in reliance on a good faith belief that what he is doing is constitutionally permissible, he is immune to damages as a consequence of his action even if it should be later established that his belief was ill-founded. *Skinner v. Spellman,* 480 F.2d 539 (4 Cir. 1973). *Cf. Eslinger v. Thomas,* 476 F.2d 225 (4 Cir. 1973); *Hill v. Rowland,* 474 F.2d 1374 (4 Cir. 1973). In applying the test, however, the district court seemed to conclude that because the defendants appeared to have complied with both the substance of the written directive with regard to the isolation of prisoners suspected of mental illness and the "normal operating procedure" of removing the clothing of "a prisoner who had exhibited an unstable mental and emotional state," 367 F.Supp. at 1217, immunity to damages followed as a matter of course. We do not perceive that the immunity doctrine may be applied in this fashion. Additional findings must be made before it may be properly concluded that defendants are immune, and it may be necessary to adduce additional evidence for those findings to be made.

Most important, defendants may not avail themselves of the defense until they have proved that they had a good-faith belief in the legality of what they did. Since what is sought to be proved is a matter of defense, the burden of proof is upon them.

After "the preparation of the majority opinion," *id.* at 371, the Supreme Court issued an opinion on defenses to section 1983 actions in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). In *Wood,* defendant school board members and school administrators were alleged to have denied to plaintiff due process by expelling them from school. Mr. Justice White, writing for himself and four other members of the Court, stated (at 321–22, 95 S.Ct. at 1000):

The disagreement between the Court of Appeals and the District Court over the immunity standard in this case has been put in terms of an *"objective"* versus a *"subjective"* test of good faith. As we see it, the appropriate standard necessarily contains *elements of both.* The official himself must be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of *settled, indisputable law* on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice.

To be entitled to a special exemption from the categorical remedial language of § 1983 in a case in which his action violated a student's constitutional rights, a school board member, who has voluntarily undertaken the task of supervising the operation of the school and the activities of the students, must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of his charges. Such a standard neither imposes an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system. Any lesser standard would deny much of the promise of § 1983. Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 *if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student.* That is not to say that school board members are "charged with predicting the future course of constitutional law." *Pierson v. Ray,* 386 U.S., at 557, [87 S.Ct., at 1219.] *A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the*

*student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.* [Emphasis supplied.]

In *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), the Supreme Court made clear that the *Wood* formulation should be given wide applicability. In *O'Connor,* a civilly committed inmate of a mental hospital sued the hospital superintendent, seeking monetary damages under section 1983. Mr. Justice Stewart, writing for a unanimous Court, remanded the case for further consideration of the good faith defense in the light of *Wood,* with the following comment (at 576–77, 95 S.Ct. at 2494):

O'Connor contends that in any event he should not be held personally liable for monetary damages because his decisions were made in "good faith." Specifically, O'Connor argues that he was acting pursuant to state law which, he believed, authorized confinement of the mentally ill even when their release would not compromise their safety or constitute a danger to others, and that he could not reasonably have been expected to know that the state law as he understood it was constitutionally invalid. A proposed instruction to this effect was rejected by the District Court.

The District Court did instruct the jury, without objection, that monetary damages could not be assessed against O'Connor if he had believed reasonably and in good faith that Donaldson's continued confinement was "proper," and that punitive damages could be awarded only if O'Connor had acted "maliciously or wantonly or oppressively." The Court of Appeals approved those instructions. But that court did not consider whether it was error for the trial judge to refuse the additional instruction concerning O'Connor's claimed reliance on state law as authorization for Donaldson's continued confinement. Further, neither the District Court nor the Court of Appeals acted with the benefit of this Court's most recent decision on the scope of the qualified immunity possessed by state officials

under 42 U.S.C. § 1983. *Wood v. Strickland,* 420 U.S. 308, [95 S.Ct. 992, 43 L.Ed.2d 214.]

Under that decision, the relevant question for the jury is whether O'Connor "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of [Donaldson], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to [Donaldson]." *Id.* at 322, [95 S.Ct. at 1001.] See also *Scheuer v. Rhodes,* 416 U.S. 232, 247–248, [94 S.Ct. 1683, 1692, 40 L.Ed.2d 90;] *Wood v. Strickland, supra,* at 330, [95 S.Ct. at 1005] (opinion of Powell, J.). For purposes of this question, an official has, of course, no duty to anticipate unforeseeable constitutional developments. *Wood v. Strickland, supra,* at 322, [95 S.Ct. at 1004.]

Accordingly, we vacate the judgment of the Court of Appeals and remand the case to enable that court to consider, in light of *Wood v. Strickland,* whether the District Judge's failure to instruct with regard to the effect of O'Connor's claimed reliance on state law rendered inadequate the instructions as to O'Connor's liability for compensatory and punitive damages. [Footnotes omitted.]

Taken together, *Wood* and *O'Connor* indicate not only that there are both subjective and objective aspects to the section 1983 good faith defense, but also that a good faith defense does not meet the required standard of objectivity, when the state of the applicable law is settled and undisputed, unless the actor's belief in the constitutionality of his action was in fact reasonable under such settled, undisputed law.

The Supreme Court has not specifically held that the *Wood-O'Connor* approach to the good faith defense is applicable in an alleged unlawful arrest situation. However, in a number of federal cases, the courts have applied that test to "a wide variety of executive and administrative per-

sonnel." [16]  In the addendum to his opinion in *McCray v. Burrell*, 516 F.2d 357 (4th Cir. 1975) (en banc), Judge Winter (at 371–72) seemingly indicates that *Wood* is generally applicable in a section 1983 suit:

> Since the preparation of the majority opinion, the Supreme Court has decided *Wood v. Strickland*, 420 U.S. 308, [95 S.Ct. 992, 43 L.Ed.2d 214] (1975), a case having relevance to Part IV of our opinion dealing with the defense of official immunity.  *Wood* concerned the immunity of school officials to suits for damages under 42 U.S.C. § 1983 brought by students who claimed that they had been disciplined in violation of their constitutional rights.  The holding that school officials are entitled to qualified immunity proceeded as an extension and application of *Tenney v. Brandhove*, 341 U.S. 367, [71 S.Ct. 783, 95 L.Ed. 1019] (1951); *Pierson v. Ray*, 386 U.S. 547, [87 S.Ct. 1213, 18 L.Ed.2d 288] (1967); and *Scheuer v. Rhodes*, 416 U.S. 232, [94 S.Ct. 1683, 40 L.Ed.2d 90] (1974).  * * *

> We think that what is said on the subject in the main opinion is consistent with *Wood*, and that *Wood* constitutes additional authority for the conclusions reached therein.

■  Thus, in order to determine whether or not the defendant herein has met his burden of establishing his good faith defense in connection with the alleged unlawful arrest complaint, this Court must first consider subjective good faith and then consider the reasonableness of the defendant's belief that his arrest of plaintiff was legal.  In this case, this Court finds without hesitation that at the time of the arrest defendant acted without any malice toward plaintiff, and with no intention to deprive her of any of her constitutional or other rights.  Additionally, this Court concludes that defendant was following standard operating procedures and that there did not exist at the time of the arrest settled, indisputable law of which Anderson was or should have been aware and which he reasonably should have understood, if he had known of the same, prohibited the arrest which he made.

### Probable Cause for Search and Good Faith Defense Thereto

■  This Court accepts Anderson's testimony as to the approved, standard operating practices and procedures of the Baltimore City Police Department which Anderson testified he followed.  In so doing this Court notes that those practices and procedures were unwritten and that the Fourth Circuit in *McCray* (at 370–71) did not foreclose the premising of a good faith defense upon unwritten practices and procedures.  However, a careful, specific factual analysis is needed before this Court may conclude that reliance by the defendant thereon constitutes sufficient basis to establish that element of the good faith defense.  Of course, written rather than unwritten guidelines on issues as important as "trying up" are highly preferable.  *See Huotari v. Vanderport*, 380 F.Supp. 645 (D.Minn.1974), in which Judge Heaney, then a District Judge, commented (at 651–52 n.1):

> Officer Wutz testified that there were no departmental procedures or rules as to when a search warrant ought be obtained to enter a home to effect an arrest.  *  * [I]t is difficult to understand the failure of the City to provide detailed guidelines in this important area.  Such guidelines, in addition to protecting the citizenry from unreasonable intrusions such as that suffered by Mrs. Huotari, would also assist the police officer in making some of

---

**16.** *Developments in the Law—Section 1983 and Federalism*, 90 Harv.L.Rev. 1133, 1214 n. 142, 1215–16 n. 150, and cases cited therein (1977).  *See also* the discussions in *Dellums v. Powell*, 566 F.2d 231 (D.C.Cir.1977); *Wolfel v. Sanborn*, 555 F.2d 583, 590 *et seq.* (6th Cir. 1977); *Kermit Construction Corp. v. Banco Credito Y Ahorro Ponceno*, 547 F.2d 1, 2–3 (1st Cir. 1976); *Davis v. Passman*, 544 F.2d 865, no, 528 F.2d 856, 858 n. 5 (1st Cir. 1976).

881–82, *pet. for reh. en banc granted*, 553 F.2d 506 (5th Cir. 1977); *Kellerman v. Askew*, 541 F.2d 1089, 1091 (5th Cir. 1976); *Guzman v. Western State Bank of Devils Lake*, 540 F.2d 948, 951–52 (8th Cir. 1976); *Hazo v. Geltz*, 537 F.2d 747, 750 (3d Cir. 1976); *Morris v. Traviso-*

the difficult daily decisions demanded of him by his occupation.

In *Lankford v. Gelston,* 364 F.2d 197 (4th Cir. 1966) (en banc), in dealing with a quest for injunctive relief, Judge Sobeloff, speaking for the Court, held (at 200–01, 203) that the written Baltimore City guidelines concerning entries to serve arrest warrants were inadequate because of their failure to specify, *inter alia,* that officers should not rely on anonymous tips. In this case, plaintiff seeks neither declaratory nor injunctive relief, and asks for the award of damages only from Anderson. Anderson can hardly be individually faulted for the failure of the Department to reduce to writing its approved practices with respect to "try ups," as long as he followed those practices.

The exact state of the law with respect to requirements of the Fourth Amendment concerning entries into homes in order to make warrantless arrests can fairly be characterized as unsettled. In *United States v. Watson,* 423 U.S. 411, 418 n.6, 96 S.Ct. 820, 825, 46 L.Ed.2d 598 (1976), decided by the Supreme Court five days before the incident in question in this case, Mr. Justice White, for himself and four other members of the Court, wrote:

In the case before us the Court of Appeals relied heavily, but mistakenly, on *Coolidge v. New Hampshire,* 403 U.S. 443, 480–481, [91 S.Ct. 2022, 2045–2046, 29 L.Ed.2d 564] (1971), for as we noted in *Gerstein v. Pugh,* 420 U.S. [103], at 113 n.13, [95 S.Ct., at 863,] [(1975)], the still unsettled question posed in that part of the Coolidge opinion was "whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest." Watson's midday public arrest does not present that question.

In *United States v. Santana,* 427 U.S. 38, 45, 96 S.Ct. 2406, 2411, 49 L.Ed.2d 300 (1976), Mr. Justice Marshall, dissenting, commented:

The Court declines today to settle the oft-reserved question of whether and under what circumstances a police officer may enter the home of a suspect in order to make a warrantless arrest. * * *

*Inter alia,* Mr. Justice Marshall cited in support of that comment *United States v. Watson,* 423 U.S. 411, 418 n.6, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Coolidge v. New Hampshire,* 403 U.S. 443, 480–81, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

Mr. Justice White, concurring in *Santana,* 427 U.S. at 43–44, 96 S.Ct. at 2410, wrote:

It is not disputed here that the officers had probable cause to arrest Santana and to believe that she was in the house. In these circumstances, a warrant was not required to enter the house to make the arrest, at least where entry by force was not required. This has been the long-standing statutory or judicial rule in the majority of jurisdictions in the United States, see ALI, A Model Code of Pre-arraignment Procedure, 306–314, 696–697 (1975), and has been deemed consistent with state constitutions, as well as the Fourth Amendment. It is also the Institute's recommended rule. *Id.,* § 120.6. I agree with the Court that the arrest here did not violate the Fourth Amendment.

In *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), Mr. Justice Stewart, speaking for himself and four other members of the Court, commented (at 479–80, 91 S.Ct. at 2045):

If we were to accept Mr. Justice White's view that warrantless entry for purposes of arrest and warrantless seizure and search of automobiles are per se reasonable, so long as the police have probable cause, it would be difficult to see the basis for distinguishing searches of houses and seizures of effects. If it is reasonable for the police to make a warrantless nighttime entry for the purpose of arresting a person in his bed, then surely it must be reasonable as well to make a warrantless entry to search for and seize vital evidence of a serious crime. If the police may, without a warrant, seize and search an unoccupied vehicle parked on the owner's private property, not being used for any illegal purpose, then it is hard to see why they need a warrant to seize and search a suitcase, a trunk, a shopping bag, or any other port-

able container in a house, garage, or back yard.

The fundamental objection, then, to the line of argument adopted by Mr. Justice White in his dissent in this case and in *Chimel v. California,* [395 U.S. 685, [752, 89 S.Ct. 2034, 23 L.Ed.2d 685] (1969)], is that it proves too much. If we were to agree with Mr. Justice White that the police may, whenever they have probable cause, make a warrantless entry for the purpose of making an arrest, and that seizures and searches of automobiles are likewise per se reasonable given probable cause, then by the same logic *any* search or seizure could be carried out without a warrant, and we would simply have read the Fourth Amendment out of the Constitution. Indeed, if Mr. Justice White is correct that it has generally been assumed that the Fourth Amendment is not violated by the warrantless entry of a man's house for purposes of arrest, it might be wise to re-examine the assumption. Such a re-examination "would confront us with a grave constitutional question, namely, whether the forceful nighttime entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment." *Jones v. United States,* 357 U.S. [493], at 499–500, [78 S.Ct., at 1257] [(1958)].

None of the cases cited by Mr. Justice White disposes of this "grave constitutional question." [Emphasis in original.]

Despite such unsettled legal questions, there are settled minimum legal standards which govern warrantless entries into homes. Thus, in *Lankford v. Gelston,* 364 F.2d 197, 202–03 (4th Cir. 1966) (en banc), Judge Sobeloff stated:

All members of the Police Department, from the Commissioner down to the raw recruit, are expected to be familiar with the principle that if the police intend to conduct a search of a man's home for a suspect, they must at least have probable cause to believe that he is on the premises. The doctrine is not subtle; it touches the very heart of law enforcement practices, and has found expression in numerous judicial opinions.[6]

[6] [List of citations omitted.] Even a cursory reading of the Fourth Amendment will not fail to convey the idea that an essential requirement before police may enter a private home is the existence of probable cause:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In *Lankford,* the focus was upon the search of a large number of homes of persons other than the suspect, and not upon a search of the home of the suspect. In *Hayden v. Warden,* 363 F.2d 647 (4th Cir. 1966), *rev'd on other grounds,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), a search of a home not known to the police to be that of the suspect took place. Judge Sobeloff wrote (at 651):

Turning to the merits of Hayden's petition, we do not disagree with the District Court's determination that the arrest was lawful and the search conducted as an incident thereof constitutionally permissible.

Appellant does not strenuously contest the legality of his arrest. He concedes that the officers had probable cause to believe that a felony had been committed and that the felon was hiding in the house. There was testimony that the officers knocked on the door and announced the purpose of their entry. The District Court so found the facts and concluded that regardless of the asserted lack of consent on the part of Mrs. Hayden to the entrance of the police, the officers were within their legal powers in entering in "hot pursuit" of a suspected felon. [Footnote omitted.]

In *Fisher v. Volz,* 496 F.2d 333 (3d Cir. 1974), Judge Rosenn, in the course of re-

viewing the case law, commented (at 340–41):

In *United States v. McKinney,* 379 F.2d 259 (6th Cir. 1967), the court in reviewing a criminal conviction held that the police may execute a valid arrest warrant on the premises of a third party, without the need for a search warrant, if the police did "reasonably believe" that the suspect could be found on the premises searched. The court apparently considered "reasonable belief" to be synonymous with "probable cause." In determining that the police had "reasonable belief" that the suspect was within, the court relied on *McCray v. State of Illinois,* 386 U.S. 300, [87 S.Ct. 1056, 18 L.Ed.2d 62] (1967), a "probable cause" case.

The same issue was presented in *United States v. Brown,* 151 U.S.App.D.C. 365, 467 F.2d 419 (1972). In an opinion by Mr. Justice Clark, the court stated that

The arrest warrant issued under Rule 4(c) [Fed.R.Crim.Proc.] provides authority to enter any premises for the purpose of enforcing the warrant, *if the officer has probable cause to believe that the subject is located therein.* [Emphasis supplied.]

467 F.2d at 424. The court held that on the facts before it the police did have probable cause to make the entry.[12]

[12] The court in *Brown* believed that probable cause was sufficient to constitutionally permit an entry into a private home to enforce an arrest warrant. Although it made no explicit reference to "exigent circumstances," its discussion reveals that such circumstances were considered in determing the existence of probable cause.

In charging the jury that the presence or absence of probable cause was only one of several factors which were to be taken into account in determining the propriety of the police search of the Bass apartment, the district court expressly relied upon *Dorman v. United States,* 140 U.S. App.D.C. 313, 435 F.2d 385 (1970) (en banc).[13] *Dorman,* however, preceded the

[13] The factors enumerated in the charge closely parallel those listed in *Dorman.* * *

*Brown* decision by the same circuit. *Dorman* held that police who had *neither* a search warrant nor an arrest warrant could enter the home of a suspected armed robber for the purpose of arresting him, if the circumstances were reasonable in light of several factors, including "strong reason to believe that the suspect is in the premises being entered."

We do not believe *Dorman* controls the instant case, however, and we therefore need not express any view as to whether we would follow *Dorman* on its facts.[14]

[14] *See Coolidge v. New Hampshire,* 403 U.S. 443, 481, [91 S.Ct. 2022, 29 L.Ed.2d 564] (1971), where the question was also left open.

*Dorman* involved the very special circumstances where the police entered the home of the suspect himself, not the homes of one or more third parties. In such case, the court held, exigent circumstances justified the entry even in the absence of an independent finding that the police had probable cause to believe the suspect was at home.

Whether or not *Dorman* 's use of the phrase "strong reason" imports a different standard than probable cause, Judge Rosenn's review demonstrates, at the very least, that the law in that regard is not settled or indisputable.

In *Vance v. North Carolina,* 432 F.2d 984 (4th Cir. 1970), Judge Craven dealt with a claim that certain evidence seized without a search warrant from a room in a rooming house, incident to the arrest of the occupant of that room pursuant to an invalid arrest warrant, should have been excluded. In so doing, he wrote (at 990–91):

In *Dorman* the District of Columbia Court of Appeals said that the fourth amendment requires scrutiny by a judicial officer before the police may enter a dwelling to effect an arrest, unless "circumstances" justify a warrantless entry. Without excluding the possibility of other "exceptions" the court went on to articulate some of the elements relevant in determining whether "exigent circum-

stances" exist in a particular case: (1) whether a serious offense, particularly a crime of violence, is involved; (2) whether the suspect is reasonably believed to be armed; (3) whether there is a clear showing of probable cause; (4) whether strong reason exists to believe the suspect is in the premises being entered; (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended; (6) whether the entry is forcible or peaceful; and (7) whether the entry is at night. When the court applied these considerations to the facts of *Dorman,* it concluded that the police were justified in entering to arrest the defendant without a warrant.

\* \* \* \* \* \*

Only one of the *Dorman* indicia is missing: the record does not indicate that there was any particular reason for believing that Vance was on the premises entered. But this is balanced by the time of entry—the arrest occurred early in the afternoon. \* \* \*

\* \* \* \* \* \*

In addition to the "exigent circumstances" test, discussed previously, we think there are other factors, peculiar to this case and not likely to recur, tending to support the conclusion of the district judge that the seized evidence was properly admitted. Although the constitutionality of an arrest must always be objectively determined, it is not irrelevant to consider how the conduct of the police may have appeared to them and to the one arrested. For how it seemed to them may tend to affect behavior, and it is lawless behavior that is the concern of the fourth amendment.

\* \* \* \* \* \*

Although subjective factors such as these cannot be controlling, we think they mitigate the failure of the police to have obtained a valid warrant from a magistrate and partially justify the failure of the trial judge to apply a prophylactic exclusionary rule.

In this case, the offense of which Keith Thompson was suspected was unarmed robbery; there was a clear showing of probable cause that a crime had been committed and that Keith was the offender; and there was strong reason to believe Keith was in the neighborhood. There was not, however, probable cause or strong reason to believe that Keith was at his home or that he was likely to escape if not swiftly apprehended. The entry was peaceful and took place in mid-morning. Anderson followed the Baltimore City Police Department's standard operating procedure in ordering the search of the Thompson house. There is no reason to doubt that Anderson believed that procedure was lawful. Nor, under the existing state of the law, should a reasonable man with competent police training have believed he could not follow that procedure, assuming he was acquainted with the settled, indisputable law on the subject. The absence of strong reason to believe that Keith was at home would not appear fatal to the good faith defense herein any more than a similar absence in *Vance* required automatic invocation of the exclusionary rule. The views expressed by the Fourth Circuit in *Hill v. Rowland,* 474 F.2d 1374 (4th Cir. 1973), and by the Second Circuit in *Bivens* also strongly suggest that result.

In its consideration of Anderson's good faith defense asserted by him as to plaintiff's unlawful search claim, this Court places little weight, per se, upon Anderson's reasoning that most persons suspected of violent crimes are caught at home. The constitutional validity of such a premise is doubtful even if that premise were factually supported by evidence in this case rather than only conclusorily asserted, as is the case herein. In any event, that assertion can, if it is sound, be explained just as easily upon the premise that police tend to look for such suspects primarily at their homes, as upon the premise that such searches have a high probability of success. However, Keith's youthful age does seemingly provide some factual basis for a belief on Anderson's part that Keith had fled to his home. Additionally, it is to be noted that the identification of Keith as one of

the robbers was positive and seemingly reliable, and placed Keith in the general area of his home within a very short time before the search was ordered by Anderson.

These facts, together with absence of malice on Anderson's part toward Keith, his mother or anyone else involved and the following by Anderson of accepted police practice entitle Anderson successfully to assert, on both a subjective and an objective basis, his good faith defense. In so concluding, it would not seem inappropriate for this Court to comment that in its view the law does not constitutionally permit a warrantless entry into a suspect's home unless there is probable cause to believe that the suspect is at home, even in a "hot pursuit" case, except perhaps under exceptional circumstances not present herein. See Mr. Justice White's views expressed in *Santana* and in *Coolidge,* as noted and discussed *supra.* In this case, there was not probable cause for Anderson to believe Keith was at home, when Anderson ordered officers under his command to "try up" the Thompson home. While Anderson in ordering that "try up" acted in accordance with Baltimore City Police Department practice and procedure, the latter and Anderson's said order would seem constitutionally deficient. But, even if that view is correct, Anderson as an individual police officer should not be denied his good faith defense under all of the circumstances in this case and particularly in the light of the unsettled state of the law.

### State Claim

Defendant denies the commission of any violation of plaintiff's rights under federal or Maryland law and also asserts a good faith defense, as aforementioned, to plaintiff's within federal claims and an immunity defense to plaintiff's within state claim. Those two defenses are not dissimilar. In *Duncan v. Koustenis,* 260 Md. 98, 104, 271 A.2d 547, 550 (1970), the Court of Appeals of Maryland held:

17. *See also Brewer v. Mele,* 267 Md. 437, 443–45, 298 A.2d 156 (1972); *Arrington v. Moore,* 31 Md.App. 448, 456, 358 A.2d 909 (1976); *Ramsey v. Prince George's Co.,* 18 Md.App. 385, 390, 308 A.2d 217 *cert. denied,* 269 Md.

In Maryland governmental immunity is extended to all nonmalicious acts of *public officials* as opposed to *public employees* when acting in a discretionary as opposed to ministerial capacity. *Clark v. Ferling,* 220 Md. 109, 151 A.2d 137 (1959); *Cocking v. Wade,* 87 Md. 529, 40 A. 104 (1898).

In *Duncan,* Judge Barnes noted (at 106, 271 A.2d 547) that police officers and sheriffs had been held to be public officials. In *Robinson v. Board of County Comm'rs,* 262 Md. 342, 278 A.2d 71 (1971), Judge McWilliams wrote (at 347, 278 A.2d at 74):

It is clear that policemen are "public officials," *Wilkerson v. Baltimore County,* 218 Md. 271 [146 A.2d 28] (1958), *Harris v. Mayor and City Council of Baltimore,* 151 Md. 11 [133 A. 888] (1926), and that when they are within the scope of their law enforcement function they are clearly acting in a discretionary capacity. * * But, as Judge Barnes suggested, we have added the qualification that when acting in a discretionary capacity public officials, to enjoy immunity, must act without malice. Duncan, *supra,* [260 Md.] at 104[, 271 A.2d 547;] * * *.[17]

In *Brewer v. Mele,* 267 Md. 437, 298 A.2d 156 (1972), Judge Moylan wrote (at 445–46, 298 A.2d at 162):

We have never been called upon to decide that quality of malice or the means of its proof necessary to forestall governmental immunity. If it be some affirmative showing of ill will, improper motivation, or evil purpose,[5] the undisputed facts

[5] That is, the quality of malice suggested as necessary to dissipate the governmental immunity of a prison warden and a prison guard in *Carder v. Steiner,* 225 Md. 271, 275–277, 170 A.2d 220 (1961), (where the warden was charged with negligence and the guard was charged with assault).

might well reveal its total absence prior to trial and permit the assertion of the

765 (1973). The cases discussed in *McIver v. Russell,* 264 F.Supp. 22, 32–33 (D.Md.1967) precede *Duncan.*

qualified immunity. If, on the other hand, it is the mere inference of malice permitted to be drawn from the want of probable cause,[6] then even a qualified

[6] *Banks v. Montgomery Ward and Co.,* supra [212 Md. 31, 128 A.2d 600]; *Safeway Stores, Inc. v. Barrack,* supra [210 Md. 168, 122 A.2d 457]; *Kennedy v. Crouch,* 191 Md. 580, 62 A.2d 582 (1948); *Mertens v. Mueller,* 119 Md. 525, 87 A. 501 (1913); *Cooper v. Utterbach,* 37 Md. 282 (1873); *Boyd v. Cross,* 35 Md. 194 (1872), all cases involving private prosecutions. In *Goldstein v. Rau,* 147 Md. 6, 13, 127 A. 488 (1925), we said, "Malice is also a necessary element but, *when not negatived,* it may be inferred by the jury from the absence of probable cause, though no express malice be shown." (Emphasis supplied.) *Goldstein* also involved a private prosecution, wherein we did not have to decide whether the governmental status of the prosecutor may not operate, ipso facto, to negative the mere inference of malice.

immunity could never operate short of a determination of the probable cause issue, which is no immunity at all, but a defense upon the merits.[7] While the underlying

[7] That every technical defect in probable cause stemming from a policeman's misreading of an *Aguilar v. Texas* or a *Spinelli v. United States* could permit the inference of malice sufficient to carry a malicious prosecution case to the jury is the ineluctable consequence of such a position. Such broad potential for mischief is hardly compatible with the undergirding juridical philosophy that, "Suits for malicious prosecution are viewed with disfavor in law and are to be carefully guarded against." *North Point Construction Co. v. Sagner,* 185 Md. 200, 206, 44 A.2d 441 (1945).

rationale that justifies and explains the inference of malice as being an apparent motivation for the bringing by a private person of criminal charges without adequate probable cause would seem harshly inappropriate when applied to the law enforcement officer, whose occupational routine is that of bringing offenders to justice,[8] and while strong countervailing

[8] The rule might well be that, with respect to such a class of persons, the occupational mission itself, with its manifest motivation, dispels the otherwise permissible inference.

social policy might well come into play on behalf of the officer,[9] it is unnecessary to

[9] That policy is well enunciated in *White v. Towers,* 37 Cal.2d 727, 235 P.2d 209, 28 A.L.R. 2d 636 (1951):

"When the duty to investigate crime and to institute criminal proceedings is lodged with any public officer, it is for the best interests of the community as a whole that he be protected from harassment in the performance of that duty. The efficient functioning of our system of law enforcement is dependent largely upon the investigation of crime and the accusation of offenders by properly trained officers. A breakdown of this system at the investigative or accusatory level would wreak untold harm. 'Criminal law does not enforce itself. It demands the assistance of valid evidence and fearless officials to put it in execution. Because of their tendency to obstruct the administration of justice, it is the policy of the law to discourage actions for malicious prosecution'. . . . To rule otherwise would place every honest law enforcement officer under an unbearable handicap and would redound to the detriment of the body politic. 'The public welfare requires that this choice (whether or not to institute proceedings) shall be free of all fear of personal liability.'" 235 P.2d at 211.[18]

resolve the question at this time and we explicitly do not do so. * * *

**18.** *See also Arrington v. Moore,* 31 Md.App. 448, 463–64, 358 A.2d 909, 918 (1976), in which the Court of Special Appeals of Maryland stated:

It will suffice to note here only that the Court of Appeals has sufficiently guided us in defining malice for other purposes: "Actual or express malice—at least in this context—has been characterized as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *H & R Block, Inc. v. Testerman,* 275 Md. 36, 43, [338 A.2d 48.] See also cases cited therein.

The actions of the public officials here did not approach that extreme. There was *no* evidence of any evil or rancorous motive influenced by hate and certainly nothing to show a deliberate and willful injury. Beyond that, there was no evidence that the actions taken by appellants were without legal justification. Nor was there a hint of evidence of actual malice in the sense of ill will, improper motivation or evil purpose as noted in *Brewer v. Mele, supra.* Never did appellee's evidence attribute any such motives to the Mayor. To the contrary, he testified that he worked with the Mayor and Council and that, because he was employed full time by the federal government in the evenings, the Mayor had taken over some of his duties so that they were fully performed. As to the other two appellants, he stated that he knew of no reason for their conduct. Indeed, he had been, and still considered himself to be, a friend of Chief Burke.

The basis of the immunity of public officials from tort liability is that a public pur-

What this Court has concluded with regard to Anderson's assertion of a good faith defense to the alleged arrest and search allegations claimed by plaintiff under federal law applies equally to Anderson's assertion of an immunity defense in the face of the similar state law claim stated by plaintiff. Defendant has, in this Court's opinion, successfully asserted good faith and immunity defenses to all of the federal and state law claims asserted by plaintiff in this case. Accordingly, judgment will be entered herein for defendant.

pose is served by according that protection to the exercise of official discretion. *Walker v. D'Alesandro,* 212 Md. [163] at 169, [129 A.2d 148.] The maintenance of order and public peace often, as here, calls for decisiveness and precipitous action. To demand of all public officials under circumstances of apparent crisis the reflection and deliberation allowed an appellate judge may well leave disaster in its wake.