Wilbert R. HENSON, et al.

v.

BETHLEHEM STEEL CORPORATION, et al.

Civ. No. K–81–2112.

United States District Court, D. Maryland.

March 31, 1983.

Peter G. Angelos, Howard J. Schulman and Shepard A. Hoffman, Baltimore, Md., for plaintiff.

Benjamin R. Civiletti, Washington, D.C., Douglas D. Connah, Jr., and Max S. Oppenheimer, Baltimore, Md., for defendants Bethlehem Steel Corp., Salazar and Phillips.

S. Kennon Scott, Annapolis, Md., and Jeanette A. Plante, Baltimore, Md., for defendant Franz.

Emanuel H. Horn, Baltimore, Md., for defendant Gen. Refractories Co.

Christopher A. Hansen, Baltimore, Md., for defendant A.P. Green Refractories Co.

William F. Mosner and Russell D. Karpook, Towson, Md., for defendant Babcock & Wilcox Co.

Edward S. Digges, Jr., and Francis B. Burch, Jr. Baltimore, Md., for defendant Harbison Walker Refractories Co.

Robert E. Scott, Jr., Bruce R. Parker, Daniel W. Whitney and Semmes, Bowen & Semmes, Baltimore, Md., for defendants Johns-Manville Products Corp. and Johns-Manville Sales Corp.

FRANK A. KAUFMAN, Chief Judge.

## I. BACKGROUND

The within suit has been brought by six former employees of Bethlehem Steel Corporation (Bethlehem), one of defendants herein, against a multitude of defendants seeking compensatory and punitive damages for personal injuries allegedly suffered by plaintiffs from exposure to asbestos and silica dust, fibers and particulates in the course of their employment as bricklayers in Department 404 at Bethlehem's Sparrows Point steel plant near Baltimore, Maryland. One group of defendants consists of plaintiffs' former employer, Bethlehem, two licensed physicians employed by Bethlehem at its Sparrows Point medical dispensary, namely, Drs. Leopoldo Salazar

and Richard J. Phillips, and a third physician, Dr. J. Howard Franz (hereafter collectively referred to as defendant physicians), who acted as a consultant to Bethlehem for the purpose of periodically reading X rays taken of plaintiffs and other employees of Bethlehem at Sparrows Point. Another group of defendants consists of corporate defendants characterized by plaintiffs as "miners, manufacturers, processors, importers, converters, compounders, merchants and/or suppliers" of asbestos, asbestos insulation materials and asbestos-containing products.

Diversity jurisdiction exists with regard to plaintiffs' claims against all defendants except defendant physicians who, along with plaintiffs, are citizens of Maryland. Pendent party jurisdiction over defendant physicians is not claimed and in any event it is quite doubtful whether it could exist in a case in which the jurisdiction over the non-pendent parties is based upon diversity of citizenship.[1]

Plaintiffs proceed against defendants on a variety of legal theories, including, *inter alia*, negligence, strict liability, breach of warranty, conspiracy, and the intentional tort of concealing from plaintiffs the fact that fellow employees were developing occupational diseases. Those defendants who fall within the class of miners, manufacturers, etc., are proceeded against by plaintiffs only under common law principles. As to Bethlehem, plaintiffs assert liability and right to relief not only under common law principles but also under 42 U.S.C. § 1983. As to the three defendant physicians, plaintiffs proceed herein only under 42 U.S.C. § 1983.[2]

Bethlehem and the three defendant physicians have moved to dismiss the section 1983 claims on the ground that plaintiffs have not alleged any deprivation of their federally-secured rights or set forth facts which, if true, would establish that any of the said defendants acted "under color of state law" within the meaning of section 1983.

In the context of those motions to dismiss the 1983 claims of plaintiffs, the following allegations of fact, accepted as true and construed in the light most favorable to plaintiffs, are relevant and material:

Plaintiffs, all employed for many years as bricklayers in Department 404 at defendant Bethlehem's Sparrows Point plant, allege that they have developed "asbestosis and other associated and related diseases" as a result of their exposure at the Sparrows Point plant to asbestos dust, fibers and particulates, as well as silica dust. Plaintiffs contend that despite Bethlehem's knowledge of the dangers associated with such workplace contaminants, plaintiffs, as well as others at the Sparrows Point plant,[3] were never informed that they might develop asbestosis and other associated and related diseases as a result of their employment with Bethlehem. Plaintiffs further claim that Bethlehem and defendant physicians positively identified through "objective medical evidence" the onset and incremental development of such diseases in each of plaintiffs and in other employees in Department 404, in epidemic proportions; that Bethlehem and defendant physicians also knew that plaintiffs and those other employees were totally ignorant of the onset and development of such diseases and the progressive deterioration of their health which would occur if they continued to work in a contaminated environment; and that, in spite of such "objective medical evidence" of such diseases and of the

---

**1.** *See Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). In the within case, all defendants could be sued by plaintiffs in one case in the state courts if plaintiffs so desired. *See Aldinger* at 15, 96 S.Ct. at 2420; *Kenrose Mfg. Co., Inc. v. Fred Whitaker Co., Inc.,* 512 F.2d 890, 894 (4th Cir.1972).

**2.** Plaintiffs have instituted a suit in a court of the State of Maryland against the three defend-

ant physicians on the basis of common law duties. They have also filed claims against the three defendant physicians with the Maryland State Health Claims Arbitration Office.

**3.** Although the complaint often refers to others employed by Bethlehem and to persons similarly situated to plaintiffs, the within action is not brought as a class action.

knowledge that plaintiffs were totally ignorant of the dangers associated with continued exposure to the contaminated workplace, Bethlehem and defendant physicians took no steps to prevent plaintiffs' further exposure to such contaminants and, indeed, actively conspired to conceal the development of such diseases from plaintiffs and to assure plaintiffs that it was safe to continue in their duties as bricklayers at Sparrows Point.

As overt acts in furtherance of the alleged conspiracy among Bethlehem and defendant physicians, plaintiffs allege, *inter alia,* the following:

(1) The defendant physicians, contrary to express statutory mandates requiring the reporting of occupational diseases, consciously, knowingly, intentionally and willfully concealed and withheld from plaintiffs, the Maryland Workmen's Compensation Commission (Commission) and the Maryland State Department of Health the fact that plaintiffs and similar persons were being adversely affected by occupational diseases and exposure to hazardous materials in their workplace.

(2) Defendant Dr. Franz sought and/or accepted the position of expert roentgenologist on the Medical Board of the Commission (Medical Board) and, at the same time, continued to do consulting work for Bethlehem and other industrial employers in spite of his knowledge that all occupational disease claims filed by Bethlehem employees pursuant to the Maryland workmen's compensation law would come before such Board, thereby seemingly becoming involved in a conflict of interest.

(3) Defendant Dr. Franz, while serving as expert roentgenologist on the Medical Board, falsely testified on behalf of Bethlehem in an administrative hearing conducted by the Maryland Occupational Safety and Health Administration (MOSH) in November, 1980, concerning a MOSH citation in which Bethlehem was charged with failure to monitor its workplace for asbestos contamination, thus using his "official influ-

ence and prestige" to shield Bethlehem from occupational disease claims.

(4) Although defendant Dr. Franz had actual knowledge of the pulmonary conditions of plaintiffs and numerous other employees in Department 404 and knew, as a member of the Medical Board, that disclosure of such extensive incidents of pulmonary occupational disease was material to the duties and jurisdiction of the Commission, the Maryland State Department of Health and other state and federal agencies of appropriate jurisdiction, and although defendant Dr. Franz was duty-bound to disclose such information to those agencies, he nevertheless suppressed and concealed from such agencies that plaintiffs and similar persons were being and had been affected and afflicted in epidemic proportions by exposure to contaminants in their workplace.

(5) Defendant physicians acquiesced and participated in the above-described concealment in contravention of their professional duties and responsibilities to plaintiffs.

(6) The alleged conflicts of interest of Dr. Franz and of the Medical Board Chairman, Dr. James Frenkil, a non-defendant, constituted a state practice and custom which authorized, encouraged, aided and abetted the alleged conspiracy.

None of the above actions are alleged to have been anything other than private professional endeavors insofar as Bethlehem and Drs. Salazar and Phillips are concerned. Plaintiffs have alleged, however, that Dr. Franz acted to wrong them in his dual capacity as a private consultant to the Sparrows Point medical facility and as a member of the Medical Board. Dr. Franz's duties as a consulting radiologist at Sparrows Point are alleged to have begun in or about 1960, while his appointment to the Medical Board is asserted to have occurred some twelve years later, in 1972. Plaintiffs also assert that the onset of "asbestosis and other associated and related diseases" had occurred in each of plaintiffs by 1958 when Glen D. Smith contracted the same.[4]

4. It is arguable that the knowledge of the exist-

ence of plaintiffs' pulmonary occupational dis-

Plaintiffs contend that "in his role as a member of the Medical Board," Dr. Franz was "duty bound" to disclose (or to force Bethlehem to disclose) his alleged knowledge of the existence of plaintiffs' diseases not only to the plaintiffs themselves, but also to the Commission, the Maryland State Department of Health and "other state and federal agencies of appropriate jurisdiction." Thus, for purposes of the required "under color of state law" element of a section 1983 action, plaintiffs rest solely upon Dr. Franz's alleged violation of his official duties as a member of the Medical Board, an action taken in "conspiracy" with the private defendants.

Plaintiffs claim that the conspiracy to conceal from plaintiffs the development of their occupational diseases denied them rights under the workmen's compensation law of Maryland without due process of law, that they have been deprived of access, generally, to the Commission by virtue of the alleged concealment of their diseases, that said conspiracy has deprived them of their statutory benefits under the Maryland workmen's compensation law without due process of law, and that they have been deprived of due process through the denial of an impartial forum for pursuing workmen's compensation claims by virtue of Dr. Franz's presence on the Medical Board.

In addition to those allegations of deprivations of due process, plaintiffs claim that they have been denied their constitutional right to equal protection of the law. In essence, plaintiffs contend that because defendant Bethlehem and defendant physicians conspired fraudulently to withhold and conceal from the Commission, the Maryland State Department of Health, and other state and federal agencies, knowledge of the pulmonary occupational diseases at issue herein, and because said defendants falsified information furnished to MOSH,

such agencies were prevented, deterred, frustrated and inhibited in acting pursuant to their statutory mandates effectively to investigate, remedy and prevent the harmful occupational diseases and injurious work environment to which plaintiffs were exposed. The effect of those defendants' said fraudulent and conspiratorial scheme was, plaintiffs contend, a "systematic maladministration of the laws and an obstruction and manipulation thereof to the detriment of plaintiffs."[5] Plaintiffs claim that said "systematic maladministration of the laws" violates their equal protection rights.

## II. 1983's ESSENTIAL ELEMENTS

A cause of action under section 1983 requires two essential elements: "First, the plaintiff must prove that the defendant deprived him of a right secured by the 'Constitution and Laws' of the United States. Second, the plaintiff must show that the defendant ... acted 'under color of [state] law.'" *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970) (footnote omitted). In *Rendell-Baker v. Kohn*, —— U.S. ——, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), a case involving claims by several teachers and a counsellor that they had been discharged from their positions at a privately-operated nonprofit school for maladjusted high school students without due process because they had exercised their first amendment rights, the Chief Justice, writing for a majority of the Court, concluded that no state action was involved. The Chief Justice stated:

> The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights "fairly attributable to the state?" *Lugar v. Edmondson Oil Co.*, [—— U.S. ——,

eases which Dr. Franz allegedly gained through reading and interpreting annual or periodic X rays of plaintiffs was initially acquired by Dr. Franz long before he became associated with the Medical Board and at one or more times when he was acting solely in his capacity as a private consulting physician. However, in the context of defendants' motions to dismiss, it is

herein assumed that Dr. Franz gained such knowledge after he became a member of the Medical Board.

**5.** Consolidated Memorandum of Plaintiffs in Opposition to the Motions to Dismiss of Bethlehem and defendant physicians.

102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982)]. The core issue presented in this case is not whether petitioners were discharged because of their speech or without adequate procedural protections, but whether the school's actions in discharging them can fairly be seen as state action. If the action of the respondent is not state action, our inquiry ends.

102 S.Ct. at 2770 (footnote omitted).

In *Blum v. Yaretsky,* —— U.S. ——, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), involving transfers of patients between nursing homes, the nursing homes were held not to be state actors. Justice Rehnquist wrote: "[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* 102 S.Ct. at 2786.

### A. Acts under Color of State Law

■ Private parties, such as defendants Bethlehem and Drs. Salazar and Phillips, may be considered to have acted under color of state law if they were "jointly engaged with state officials in the prohibited action" or were "willful participant[s] in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.,* 398 U.S. at 152, 90 S.Ct. at 1605. *See also Lugar v. Edmondson Oil Co.,* —— U.S. ——, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (private party's "joint participation" with state officials in prejudgment seizure of property sufficient to characterize private party as state actor). Herein, plaintiffs attempt to satisfy the "color of law" requirement of section 1983 by alleging that defendants Bethlehem and Drs. Salazar and Phillips conspired with Dr. Franz, who was allegedly acting as an agent of the state, to deprive plaintiffs of their federally-secured rights. Thus, the linchpin upon which plaintiffs' section 1983 claim hangs is Dr. Franz's alleged status as an agent of the state.

Even assuming, however, that plaintiffs' charges of conspiracy by Bethlehem and Drs. Salazar and Phillips, if proven, would constitute "joint engagement" or "willful participation in joint activity" within the meaning of *Adickes* or "joint participation" within the meaning of *Lugar,* plaintiffs' allegations and written and oral representations themselves demonstrate that Dr. Franz was not acting as an agent of the State of Maryland in the alleged conspiracy. Thus, plaintiffs' allegations and representations do not satisfy the color of state law requirement of section 1983 as to either Bethlehem or any of defendant physicians. Unless Dr. Franz was acting as an agent of the state, none of the other three defendants has jointly participated with the state or acted as its agent in the alleged violations of plaintiffs' rights.

The "classic" definition of action taken "under color of state law" was set forth by the Supreme Court in *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941), in which the Court stated: "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." In construing the requirement of action "under color of state law" for purposes of 18 U.S.C. § 20 (now 18 U.S.C. § 242), the criminal counterpart to section 1983, Justice Douglas, in his plurality opinion in *Screws v. United States,* 325 U.S. 91, 111, 65 S.Ct. 1031, 1040, 89 L.Ed. 1495 (1945), stated: "It is clear that under 'color' of law means under 'pretense' of law. Thus, acts of [state] officers in the ambit of their personal pursuits are plainly excluded." *See also Rogers v. Fuller,* 410 F.Supp. 187, 192 (M.D.N.C.1976); *Johnson v. Hackett,* 284 F.Supp. 933, 937–38 (E.D.Pa.1968). Thus, acts by state employees outside of their duties as state employees are not "acts under color of law" within 42 U.S.C. § 1983.

Subsequent to *Classic,* the Supreme Court restated that construction of 1983's "under color of law" requirement in *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1962). In *Robinson v. Davis,* 447 F.2d 753 (4th Cir.1971), *cert. denied,* 405 U.S. 979, 92 S.Ct. 1204, 31 L.Ed.2d 254 (1972), defendants were police officers for a small North Carolina college town as well

as "security officers" for the college. While wearing their police uniforms and guns, and at the instruction of the dean of the college, defendants detained and questioned certain college students regarding drug dealing on campus. Writing for a majority of the court, Judge Boreman noted the absence of "control over, involvement in and direct responsibility" of the state for the actions of defendants and also the absence of state participation in the challenged acts. *Id.* at 757–58. Dissenting, Judge Butzner concluded that the various bodies charged with administration of the area and the college were so intertwined as to preclude the acts of college security officers from being viewed as non-state action.

In *Lugar v. Edmondson Oil Co.,* —— U.S. ——, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), a creditor of plaintiff-debtor, pursuant to a Virginia law, took steps to cause a state court clerk and a county sheriff to attach plaintiff-debtor's property. Plaintiff brought suit in federal district court alleging that defendants had jointly acted with state officials to deprive plaintiff of his property without due process of law. Writing for a 5–4 majority, Justice White wrote: "While private abuse of a state statute does not describe conduct that can be attributed to the state, the procedural scheme created by the statute obviously is the product of state action." *Id.* 102 S.Ct. at 2756. The Justice concluded that the defendant-creditor was acting under color of state law in participating in a deprivation of plaintiff-debtor's property pursuant to an unconstitutional Virginia statute, but not with regard to "misuse or abuse of the statute." In the course of so doing, he set forth a two-part test for determining when an action is taken "under color of state law":

> Our cases have accordingly insisted that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the state. These cases reflect a two-part approach to this question of "fair attribution." First, the deprivation must be caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state.

*Id.* 102 S.Ct. at 2754.

Considered under the two-part approach approved in *Lugar,* the acts of Dr. Franz complained of by plaintiffs are not "fairly attributable to the state." First, Dr. Franz's acts of concealment were not "caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state." Indeed, plaintiffs themselves allege that Dr. Franz's acts were in direct contravention of his duties under state statutory and common law, as well as under the standards of his profession. Second, it can hardly be said that the state was "responsible" for Dr. Franz's conduct in his capacity as a private consulting radiologist for Bethlehem. Third, and for the same reason, Dr. Franz's alleged unlawful conduct cannot "fairly be said to be [the acts of] a state actor." Dr. Franz, like many professionals, wears more than one hat. When reading the X rays of employees at Bethlehem, he was wearing his private consultant hat, not his member-of-the-Medical-Board hat. Dr. Franz was a private consulting radiologist for Bethlehem for twelve years before becoming a member of the Medical Board and he continued so to act after his appointment to said Board. The acts taken by Dr. Franz in his capacity as a private consulting radiologist for Bethlehem, including testifying on Bethlehem's behalf during a MOSH administrative hearing, were acts taken solely in his private, individual capacity and not acts taken in his official capacity as a member of the Medical Board. As such, they cannot "be fairly attributable to the state."

Plaintiffs argue that Dr. Franz's acts as a private consulting radiologist for Bethlehem took on an official character after his appointment to the Medical Board because

Dr. Franz was thereafter under a "duty" to disclose the existence of plaintiffs' pulmonary occupational diseases to plaintiffs, to the Commission, to the State Department of Health and to other state and federal agencies of appropriate jurisdiction. As sources of that duty, plaintiffs rely upon Dr. Franz's responsibilities as a member of the Medical Board and under the Maryland workmen's compensation law, Dr. Franz's required loyalty to the Commission as one of his employers, and Dr. Franz's "fiduciary duty to the people of Maryland" as a public trustee. Plaintiffs further contend that Dr. Franz breached that duty by willfully conspiring with Bethlehem and Drs. Salazar and Phillips to conceal the existence of plaintiffs' said diseases.

Even if Dr. Franz was under a duty imposed by state law to disclose the existence of plaintiffs' said diseases, his breach of that duty, standing alone, would not constitute action taken under state law. Nor would any such breach, even if other members of the Medical Board similarly breached such duty, constitute a state policy pursuant to which Dr. Franz's alleged breach amounted to action under color of state law. To the contrary, such action was, according to plaintiffs, action taken in clear and direct contravention of state law. Plaintiffs do not claim that Dr. Franz was able so to conceal the existence of plaintiffs' diseases through the "misuse of power, possessed by virtue of state law" or that said concealment was "made possible only because [Dr. Franz was] clothed with the authority of state law," *United States v. Classic*, or by the "exercise of some right or privilege created by the state or by a rule of conduct imposed by the state." *Lugar v. Edmondson Oil Co.*, —— U.S. at ——, 102 S.Ct. at 2754. Rather, plaintiffs contend only that plaintiffs were injured because Dr. Franz breached a duty imposed on him by state law to disclose plaintiffs' diseases. Such contentions fail to state claims under section 1983. In *Lugar*, Justice White wrote:

> Petitioner presented three counts in his complaint. . . . Count two alleged that the deprivation of property resulted from

respondents' "malicious, wanton, willful, opressive [*sic*], [and] unlawful acts." By "unlawful", petitioner apparently meant "unlawful under state law." To say this, however, is to say that the conduct of which petitioner complained could not be ascribed to any governmental decision; rather, respondents were acting contrary to the relevant policy articulated by the state. Nor did they have the authority of state officials to put the weight of the state behind their private decision, *i.e.*, this case does not fall within the abuse of authority doctrine recognized in *Monroe v. Pape, supra.* That respondents invoked the statute without the grounds to do so could in no way be attributed to a state rule or a state decision. Count two, therefore, does not state a cause of action under § 1983 but challenges only private action.

—— U.S. at ——, 102 S.Ct. at 2756.

Plaintiffs argue that, under applicable Maryland statutory law, Dr. Franz had a duty as a member of the Medical Board to disclose the information which he is alleged to have obtained in connection with his performance of his duties at Bethlehem. The difficulty with plaintiffs' position in that regard is that it is not supported by any provision of the statutes of the State of Maryland or by any principle of common law suggested to this court. In general, the Medical Board's duties are confined to conducting investigations and hearings and rendering decisions in cases referred to the Medical Board by the Commission.

The Maryland Code provides, in pertinent part:

> The Workmen's Compensation Commission *shall refer every claim* for compensation for an occupational disease *to the medical board for investigation, hearing and report,* excepting, however, such cases wherein there are not controverted medical issues. No award shall be made *in any such case* until the medical board shall have duly investigated and heard the case and made its report and its deci-

sions with respect to all medical questions at issue.

\* \* \* \* \* \*

The medical board, *upon reference to it of a claim for occupational disease,* shall notify the claimant or claimants and the employer to appear before it at a time and place stated in said notice. At such hearing either party may offer testimony of such witnesses as they may desire, which shall become a part of the record of the proceedings before the medical board.

\* \* \* \* \* \*

The medical board shall, as soon as practicable *after it has completed its consideration of the case,* report in writing its findings and conclusions on every medical question in controversy.

Md.Ann.Code art. 101, § 28 (emphasis added). Additionally, the Maryland Code has contained since 1979 ethical provisions requiring, *inter alia,* a state official or employee to disqualify himself from matters in which he or his relative has an interest, and restricting employment of an official or employee by any entity subject to the authority of that official or employee. Md.Ann. Code art. 40A, §§ 3–101, 3–103.[6] There is no other part of any Maryland statute known to this Court which would appear to impose any other duties on a member of the Medical Board. Nevertheless, plaintiffs contend that Dr. Franz, as a member of the Medical Board, undertook to respect and act in accordance with all provisions of applicable law and that when he failed to disclose alleged violations of law, concerning which he obtained knowledge in performance of his non-state duties for Bethlehem, he automatically violated his duty as a state official. If that argument is a sound one, it would mean that official governmental action would be involved any time any governmental official at any level took part, in his private, nongovernmental capacity, in any violation of law and failed to disclose the same to officials and bodies of the

government which he served, *e.g.,* the United States, a state, a county or a city. Both the letter and the spirit of the Supreme Court's approach to the meaning of "acts under color of state law" under section 1983 require rejection of that approach.

In sum, plaintiffs' section 1983 claims do not challenge the lawfulness of actions taken by Dr. Franz, the other two defendant physicians or Bethlehem "under color of state law." Plaintiffs challenge only actions which at most may constitute misuse or abuse of powers and duties by Dr. Franz as a private citizen, *see Lugar v. Edmondson Oil Co.,* —— U.S. at ——, 102 S.Ct. at 2756, or acts by Dr. Franz, a state official, in the "ambit" of his nongovernmental "pursuits." *See Screws v. United States,* 325 U.S. at 111, 65 S.Ct. at 1040. But even if plaintiffs' allegations, which are the subject of the motions of Bethlehem and defendant physicians under consideration in this opinion, could, by any stretch of the imagination, be held to have satisfied the color of state law requirement of section 1983, plaintiffs' 1983 claims must be dismissed for failure to allege deprivation of any federally-secured rights.

**B.** *Deprivation of Federally-Secured Rights*

[2] 1. *Due Process.* The primary thrust of plaintiffs' due process argument appears to be that, by concealing from plaintiffs their alleged occupational diseases, defendants deprived plaintiffs of a property right or entitlement within the protection of the fourteenth amendment, *i.e.,* statutory benefits under the workmen's compensation law—monetary compensation, medical treatment and other benefits, without affording plaintiffs an opportunity for a hearing before the Commission on the issue of plaintiffs' eligibility for such benefits. Plaintiffs' due process argument also seemingly asserts a deprivation of plaintiffs' right to an impartial tribunal for adjudicating their potential claims for benefits under the workmen's compensation

---

**6.** Prior to 1979, ethical standards were set forth in the Maryland Code of Ethics for Executive Branch Officers and Employees.

laws and a deprivation of plaintiffs' right of "access" to the Commission.

The Supreme Court has in a series of decisions refused to allow section 1983 and the fourteenth amendment to become sources of a general federal tort law. In *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), plaintiff brought a defamation action under section 1983 against two chiefs of police who had circulated plaintiff's picture among local merchants under the heading "Active Shoplifters." Plaintiff claimed that such circulation impermissibly deprived him of a "liberty" interest protected by the fourteenth amendment since he was not, in fact, an active shoplifter. The Supreme Court, in an opinion by Justice Rehnquist, rejected plaintiff's contentions, stating:

> Respondent . . . has pointed to no specific constitutional guarantee safeguarding the interest he asserts has been invaded. Rather, he apparently believes that the Fourteenth Amendment's Due Process Clause should ex proprio vigore extend to him a right to be free of injury wherever the State may be characterized as the tortfeasor. But such a reading would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States. We have noted the "constitutional shoals" that confront any attempt to derive from congressional civil rights statutes a body of general federal tort law, *Griffin v. Breckenridge,* 403 U.S. 88, 101–02, 91 S.Ct. 1790, 1797–98, 29 L.Ed.2d 338 (1971), a fortiori, the procedural guarantees of the Due Process Clause cannot be the source for such law.

424 U.S. at 700–01, 96 S.Ct. at 1160.

In *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), Taylor, an inmate of a Nebraska prison, ordered certain hobby materials by mail. The packages containing these materials, however, were lost when the normal procedure for receipt of mail packages was not followed. Taylor brought an action under section 1983 claiming that the negligent loss of his property by prison officials constituted a depri-

vation of that property without due process of law in violation of Taylor's fourteenth amendment rights. The Supreme Court, again speaking through Justice Rehnquist, held that Taylor had not stated a sufficient claim of an unconstitutional denial of due process. Justice Rehnquist first observed:

> Unquestionably, respondent's claim satisfies three prerequisites of a valid due process claim: the petitioners acted under color of state law; the hobby kit falls within the definition of property; and the alleged loss, even though negligently caused, amounted to a deprivation. Standing alone, however, these three elements do not establish a violation of the Fourteenth Amendment. Nothing in that Amendment protects against all deprivations of life, liberty or property by the State. The Fourteenth Amendment protects only against deprivations "without due process of law." *Baker v. McCollan,* 443 U.S. [137] at 145 [99 S.Ct. 2689 at 2695, 61 L.Ed.2d 433]. Our inquiry therefore must focus on whether the respondent has suffered a deprivation without due process of law. In particular, we must decide whether the tort remedies which the State of Nebraska provides as a means of redress for property deprivations satisfy requirements of procedural due process.

*Id.* 451 U.S. at 536–37, 101 S.Ct. at 1913 (footnote omitted). Noting prior cases in which the Court had upheld postdeprivation hearings as sufficient guarantees of due process in cases where predeprivation hearings were impracticable or where public policy dictated immediate action by the state, Justice Rehnquist concluded:

> The justifications which we have found sufficient to uphold takings of property without any predeprivation process are applicable to a situation such as the present one involving a tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee. In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a

meaningful hearing before the deprivation takes place. The loss of property, although attributable to the State as action under "color of law," is in almost all cases beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible to provide a meaningful hearing before the deprivation. That does not mean, of course, that the State can take property without providing a meaningful postdeprivation hearing. The prior cases which have excused the prior-hearing requirement have rested in part on the availability of some meaningful opportunity subsequent to the initial taking for a determination of rights and liabilities.

*Id.* at 541, 101 S.Ct. at 1915. Applying this reasoning to the facts of *Parratt,* Justice Rehnquist wrote:

Application of the principles recited above to this case leads us to conclude the respondent has not alleged a violation of the Due Process Clause of the Fourteenth Amendment. Although he has been deprived of property under color of state law, the deprivation did not occur as a result of some established state procedure. Indeed, the deprivation occurred as a result of the unauthorized failure of agents of the State to follow established state procedure. There is no contention that the procedures themselves are inadequate nor is there any contention that it was practicable for the State to provide a predeprivation hearing. Moreover, the State of Nebraska has provided respondent with the means by which he can receive redress for the deprivation. The State provides a remedy to persons who believe they have suffered a tortious loss at the hands of the State.

*Id.* at 543, 101 S.Ct. at 1916. Justice Rehnquist concluded the opinion by reiterating the reluctance of the Supreme Court to

allow all torts committed by any person arguably acting under color of state law to be elevated into constitutional violations:

Our decision today is fully consistent with our prior cases. To accept respondent's argument that the conduct of the state officials in this case constituted a violation of the Fourteenth Amendment would almost necessarily result in turning every alleged injury which may have been inflicted by a state official acting under "color of law" into a violation of the Fourteenth Amendment cognizable under § 1983. It is hard to perceive any logical stopping place to such a line of reasoning. Presumably, under this rationale any party who is involved in nothing more than an automobile accident with a state official could allege a constitutional violation under § 1983. Such reasoning "would make of the Fourteenth Amendment a font of tort law to be superimposed · upon whatever systems may already be administered by the States." *Paul v. Davis,* 424 U.S. 693, 701 [96 S.Ct. 1155, 1160, 47 L.Ed.2d 405] (1976). We do not think that the drafters of the Fourteenth Amendment intended the Amendment to play such a role in our society.

*Id.* 451 U.S. at 544, 101 S.Ct. at 1917.[7]

The rationale underlying the decision in *Parratt* seemingly applies with equal force to the within case. Dr. Franz's conspiracy to conceal the existence of plaintiffs' occupational diseases was not undertaken pursuant to any "established state procedure." To the contrary, plaintiffs have asserted that Dr. Franz's action violated his statutory and common law duties. Further, plaintiffs do not contend that the procedures under the Maryland workmen's compensation law were inadequate to protect plaintiffs' constitutional due process rights. In-

---

**7.** Justice Rehnquist relied in part in *Parratt,* at 542–43, 101 S.Ct. at 1916, upon the Supreme Court's earlier decision in *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), in which the Court refused to find that corporal punishment in public schools violated due process, thus perhaps suggesting that the availability of an adequate state postdepriva-

tion remedy precludes assertion of due process violations not only in cases of negligent deprivation of property rights, but also in cases of intentional deprivation of nonproperty interests. *See* Kirby, *Demoting 14th Amendment Claims to State Torts,* 68 A.B.A.J. 167, 170–71 (1982).

deed, plaintiffs assert that by concealing from plaintiffs the knowledge of their alleged diseases, Dr. Franz and the other defendants deprived plaintiffs of benefits which plaintiffs would otherwise have received under those laws.

In a situation such as in the within case where the deprivation is alleged to have been caused by the unauthorized act of a state official, *Parratt* suggests that "it is not only impracticable, but impossible to provide a meaningful hearing before the deprivation." 451 U.S. at 541, 101 S.Ct. at 1916. Because it was the alleged random and unauthorized acts of an alleged state official, Dr. Franz, and not an established state procedure, which allegedly caused the injuries to plaintiffs in the within case, the State could not "predict precisely when the loss [would] occur." *Id.* Therefore, absent a showing that the state will not now provide an avenue of relief, plaintiffs have not alleged a due process violation under the Court's reasoning in *Parratt.*

▮ Although Maryland, unlike Nebraska, does not provide statutorily for tort actions against state officials, Maryland law recognizes that allegations of malicious, intentional and tortious violation of statutory duties are sufficient to avoid the bar of absolute immunity of government officers, performing discretionary duties, from suit. *See Duncan v. Koustenis,* 260 Md. 98, 104, 271 A.2d 547, 550 (1970); *Clark v. Ferling,* 220 Md. 109, 114–15, 151 A.2d 137, 140 (1959). *See also Thompson v. Anderson,* 447 F.Supp. 584, 598 (D.Md.1977). Moreover, even if Maryland law precluded suit against Dr. Franz in his official capacity, plaintiffs can demonstrate no bar to suit under state law against Bethlehem and Drs. Salazar and Phillips. Because these private party defendants are amenable to suit in state court, *Parratt* would seem to preclude

relief under section 1983 as against them, if not as against Dr. Franz.[8]

Even if plaintiffs had asserted or could establish the unavailability of a state remedy, however, they would nonetheless have failed to allege a deprivation of due process. Plaintiffs claim that they have been denied their due process rights because defendants concealed from plaintiffs the fact that they suffer from occupational diseases compensable under the workmen's compensation law of Maryland, thereby denying plaintiffs their benefits under said law without a hearing before the Commission. Plaintiffs contend that their claim of eligibility for workmen's compensation benefits constitutes a right or entitlement protected by the fourteenth amendment which cannot be denied without affording plaintiffs an opportunity to be heard. *See generally, Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

At the time plaintiffs instituted the within case, they had not filed claims before the Commission with respect to the injuries they assert in this case.[9] However, prior to oral argument in this case on the motions to dismiss plaintiffs' section 1983 claims made by Bethlehem and the three defendant physicians, plaintiffs did file claims under the Maryland workmen's compensation law, but asked that proceedings in connection with those administrative claims be stayed pending further developments in this case.

The welfare recipients in *Goldberg* had, at least at some point in the past, applied for the benefits which were being terminated. The Supreme Court held that plaintiffs' continued eligibility could not be determined without a hearing. *See also Roth,* 408 U.S. at 576, 92 S.Ct. at 2708. Herein, plaintiffs not only have not been denied continuation of benefits, but there has been

---

**8.** Of course, even if Dr. Franz cannot be sued in his official capacity, he can be sued within the state system in his private capacity, as plaintiffs have done by filing claims against him, as well as Drs. Salazar and Phillips. *See supra* n. 2.

**9.** Md.Ann.Code art. 101, § 44 provides for an election of remedies between a workmen's compensation claim and a cause of action against the employer in the courts where "injury or death results to a workman from the deliberate intention of the employer to produce such injury or death."

no determination concerning benefits related to the matters at issue in this case. Indeed, plaintiffs have themselves made an election as to when and to what extent they desire to avail themselves of the administrative process under the Maryland workmen's compensation law.[10]

Plaintiffs seemingly suggest that they have somehow been deprived of an impartial tribunal for the adjudication of workmen's compensation claims because of Dr. Franz's dual positions as member of the Medical Board and as private consulting radiologist for Bethlehem. Thus, plaintiffs assert that Dr. Franz put himself in a potential conflict of interest because of the possibility of an improper bias on his part in favor of Bethlehem during the course of Medical Board hearings with regard to claims filed by employees of Department 404 or other Bethlehem employees. Plaintiffs stated on the record during oral argument in this case on July 8, 1982, however, that Dr. Franz had resigned as a member of the Medical Board prior to the time that plaintiffs filed their claims with the Commission.

■ Further, counsel for plaintiffs stated on the record during said oral argument that plaintiffs are not urging that Dr. Franz at any time has ever taken part in consideration or discussion as a member of the Medical Board within the structure of the Commission of any claims of plaintiffs in the within case, even if it be assumed that Dr. Franz would have had a bias against plaintiffs if plaintiffs had instituted proceedings before the Commission while Dr. Franz was serving on the Medical Board. Plaintiffs thus cannot meritoriously complain of having been required to proceed before a tribunal upon which Dr. Franz served since plaintiffs at no time caused any activity to take place in connection with their within claims before the Commission while Dr. Franz had any con-

nection with that body. Accordingly, plaintiffs have not alleged injury in fact sufficient to establish their standing to challenge Dr. Franz's position on the Medical Board. "Injury in fact," economic or otherwise, is a fundamental requirement of an Article III "case or controversy." *See, e.g., Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

■ Finally, plaintiffs seemingly claim that they have been denied "access" to the Commission. Plaintiffs claim that defendants have denied that right of access to the Commission "by concealing from [plaintiffs] the essential fact of their right to resort to the Commission, *i.e.,* that they suffer from occupational diseases compensable under the Act which the Commission administrates."[11] Access to the hearing process is a fundamental element of the due process guarantee of the fourteenth amendment. *See Boddie v. Connecticut,* 401 U.S. 371, 376, 91 S.Ct. 780, 785, 28 L.Ed.2d 113 (1971); *McCray v. Maryland,* 456 F.2d 1, 6 (4th Cir.1972). However, the cases in which courts have found an unconstitutional denial of "access" are ones in which the potential litigant has sought or wishes to seek access to the hearing process, but has been met by a barrier at the threshold, *see, e.g., Boddie,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (filing fee assessed against indigent litigants seeking divorce); *McCray,* 456 F.2d 1 (negligence of clerk allegedly impeded filing of prisoner's petition for post-conviction relief), or has been inhibited or deterred, directly or indirectly, from seeking redress of his grievance. *See, e.g., Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (insufficient legal research facilities afforded to incarcerated potential plaintiffs); *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (rule prohibiting prisoners from helping

10. Under Maryland law, compensation benefits are not provided to all persons injured on the job, but rather only to those who make timely application therefor, *see* Md.Ann.Code art. 101, § 39(a), and who are determined to be eligible to receive the same.

11. Consolidated Memorandum of Plaintiffs in Opposition to the Motions to Dismiss of Bethlehem and the defendant physicians.

other prisoners prepare habeas corpus petitions). In the within case, plaintiffs have not been in any way denied access to the Commission's processes or to the processes of any court. In sum, plaintiffs' due process contentions would appear without merit.

■ 2. *Equal Protection.* The doctrine of equal protection of the law concerns the propriety of legislative classifications. Plaintiffs do not claim that the Maryland workmen's compensation law makes any improper classifications. Rather, plaintiffs seemingly rest their equal protection claim on the "as applied" theory of *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), in which the Court stated:

> Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution.

Assuming, *arguendo* only, that plaintiffs have established the requisite action under color of state law on the part of plaintiffs in the alleged "systematic maladministration of the laws," plaintiffs have still failed to allege any "unjust and illegal discriminations between persons in similar circumstances" by any defendant in the course of administering any law. Unlike the situation in *Yick Wo,* plaintiffs in the within case have failed to allege any differentiation whatsoever among similarly situated persons, much less any illegal differentiation, by the acts of defendants. Nowhere do plaintiffs make a single reference to classification or differentiation among persons. Plaintiffs have not alleged that de-

fendants—and, most importantly, that Dr. Franz—informed *any* persons, whether other Bethlehem employees or non-Bethlehem employees, of their development of occupational diseases or of their right to file workmen's compensation claims. Plaintiffs do not even contend that any defendant has treated any person in anything except the same way.

Plaintiffs further assert that defendants have violated their statutory or other duties toward plaintiffs by failing to disclose to state and federal agencies of appropriate jurisdiction the existence of the alleged occupational diseases. Assuming that claim to be true, no equal protection violation is shown by such breach of duty unless, as in *Yick Wo,* some persons receive benefits while others do not. Here, plaintiffs assert only an across-the-board failure by defendants, and particularly by Dr. Franz, to fulfill their duties. Plaintiffs have not claimed that defendants informed *any* state or federal agency of the existence of any occupational diseases, whether at Bethlehem or elsewhere.

Denial of equal protection requires disparate treatment. However egregious it may otherwise be, defendants' alleged evenhanded treatment of all persons does not constitute a denial of equal protection of the laws.[12] Under the circumstances, plaintiffs' equal protection contentions may not prevail.

## III. CONCLUSION

Accordingly, the motions to dismiss of Bethlehem and the three defendant physicians will be granted.

---

12. Defendants suggest that the rationale of *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), discussed *supra,* applies not only to due process claims but to equal protection claims as well. *See* Kirby, *Demoting 14th Amendment Claims to State Torts,* 68 A.B.A. J. 167, 171 (1982). Defendants seemingly raise, in that regard, the question of whether the state can be held to have denied any person the equal protection of the laws where the acts complained of are merely individual acts of misconduct which the state did not condone and was prepared to correct. In the light of plaintiffs' failure to claim *any* demonstrated equal protection violation, that question will not be reached herein.